Mr. Justice STRONG
 

 delivered the opinion of the court.
 

 Assuming that the subscription .made by the city to the capital stock of the company in 1853, though undoubtedly •invalid at first, became valid by the ratification ordinance adopted March 7, 1855; that thereby the chy came under obligation to give its bonds to the company in payment for the stock, so far as they had not already been given, we come directly to the question, what was the effect of the arrangement made in August and September, 1857? Here the situation of the parties at the time is of importance to be considered.
 

 The railroad company had undertaken to build a railroad ■from New Albany to Sandusky City, and it had commenced the work, relying mainly upon the bonds of the city to raise the money necessary. It had, however, been disappointed. Suits had been commenced for injunctions- to restrain the collection of a tax for paying the interest, and the consequence was that the bonds could not be sold without a ruinous sacrifice, .if sold at all. These suits were still pending. Meanwhile the company had borrowed thirty-six thousand dollars, pledging the bonds to the amount of eighty thousand dollars as collateral security. The loan had fallen due, and the holders were demanding payment, and threatening to sell the collaterals. The company was utterly unable to redeem the pledge. Its available means were completely exhausted. It could neither "go on with its work nor in any manner relieve itself. According to the weight of the evidence the bonds pledged, together with all the others still held by the company, would not have sold for enough to have paid the thirty-six thousand dollars borrowed.
 

 
 *103
 
 Turning now to the condition of the city. It had ratified its invalid subscription with an irrevocable.engagement on the part of the company, that not more than $250,000 should be called for until the railroad should be completed and put in running order át least to its junction with the Ohio and Mississippi Railroad, and then only for the purpose of furnishing the road with depots, rolling stock, &c. It had paid its bonds to the extent of $200,000 on the subscription, and it was liable to be called upon for $50,000 more. For the remainder it was liable only upon a contingency that has never happened, and that never can happen. The consideration for its subscription, it is true, had not failed, though the motive that induced it, namely, the construction of the railroad, no longer existed. The credit of the bonds which it bad issued was gone, and had it issued the remaining fifty thousand dollars, they could not have been sold for more than $8000 or $10,000. It was in these circumstances that the company applied to the city, stating its own helplessness, and it was then that the arrangement was made by which the city assumed to pay the debt of $36,000 due by the company, and sundry other moneys, and in consideration thereof obtained from the company one hundred and ninety-three bonds, which had not been negotiated, and a cancellation of the stock subscription. "Was this transaction yalid ?
 

 The bonds were negotiable instruments,'payable to bearer in not less than ten and not more than twenty years, and, of course, passing from hand to hand by delivery. Had the whole subscription been paid, it must have been with similar bonds. And the manifest design of the subscription was'to create bonds for sale in the market as the convenience or the necessities of the railroad company might require. There was no restriction in the contract upon the power of disposition, and none at law, or in equity, unless it be that the company could not part with the bonds in fraud of its stockholders or its creditors. And it had the right, which all other debtors had at the time, to make preferences among its creditors — to pay one rather than another. It is not to be disputed that, situated as the company was at the time
 
 *104
 
 When the contract of August and September, 1857, was made, with the debt of $36,000 pressing upon it, and with no other means of relief, it might have sold the entire lot of two hundred and forty-three bonds which it held, or was entitled to call for, at the best price that could have been obtained, and might have applied the entire proceeds, had they been needed, to pay that single debt. Of this, neither the stockholders nor the other creditors could have complained. What more has been done now? No doubt such a course would have involved an equal sacrifice to the company, and would, in the end, have been more disastrous to the city. Time has revealed that the bonds were worth more than they could have been sold for, but we are to look at the circumstances as they were when the transaction took place, in considering what was its nature and whether it was legal. But if a sale by the company at the market price, and an application of the whole proceeds to the payment of the $36,000 debt, would have been unimpeachable, why is it less so because the city became the purchaser? Beyond doubt, the city might lawfully buy its own bonds. Had the company sold to a stranger, and then the city become a purchaser from the stranger, it will not be contended that any creditor of the company could complain. And it can make no difference whether the purchase was made directly or indirectly from the first holder of the bonds, assuming that there was no fraud. The transaction, or the arrangement of August and September, 1857, was, in substance, plainly nothing more than a purchase by the city of its own bonds, some of which had been issued, and others of which it was under obligation to issue,' at the call of the vendor. The price paid was $36,000, besides some thousands more which the purchaser undertook to pay. Looking at it in the light of subsequent events, it was no doubt an advantageous purchase for the city; and, if the uncontradicted evidence is to be believed, it was deemed at the time an advantageous sale or arrangement for the company. Certainly it did not place the company in any worse position than it must have held had it not been made.
 

 
 *105
 
 It is, however, contended by the complainants, that the arrangement was fraudulent, both in law and in fact, and that neither the common councils of the city nor the directors of the railroad company had power to make it. In support of the proposition, that the transaction was
 
 ultra vires,
 
 we are referred to
 
 Bell
 
 v.
 
 Railroad
 
 Company,
 
 *
 
 but that case is very unlike the present. There a popular vote, under legislative sanction, had instructed the police board to subscribe a defined amount, leaving to them no discretion. The police board were agents to carry out the popular will, with limited powers. It was not, therefore, for them to subscribe a less amount, or make any other contract, than the one they had been directed to make; and this court well' said that a municipal corporation, like the board of police, could not modify or alter the stock subscription voted by the people in the absence of power from the legislature. ’ The decision, however, was placed upon other grounds. But in the present case the common council were free to exercise their own discretion. They were under no obligation to subscribe at all, and they might take as little or as much stock as they pleased, not exceeding six hundred thousand dollars. Besides, as we have seen, the arrangement.assailed by the complainants was not a modification of the subscription previously made, or a bonus given for a release. It was rather a purchase of the city debt. We think it was not beyond the power of the contracting parties.
 

 And we are not able to perceivve that it was fraudulent, either in law or in fact. It may well be doubted whether the complainants can be heard in alleging fraud. It is clear the arrangement made is binding upon the, railroad company, through which, as well as against which, they claim. They can, therefore, have no standing in court, unless the arrangement was absolutely null for want of power in the parties to make it, or unless it was fraudulent as against them, and therefore voidable at their suit. We have already seen that it was not a nullity, and the bill does not charge
 
 *106
 
 that it was fraudulent. It avers that the arrangement and compromise and attempted cancellation of the subscription were entirely null and void, but it does not allege that they were fraudulently made. In urging fraud now the complainants are setting up a case not made by the pleadings. But it is not necessary to place our decision on this ground. No doubt the subscribed capital stock of a corporation is a fund held by it in trust for its creditors, as is. also all its other property, and had the railroad company released, without equivalent consideration, or given it away, its action would have been fraudulent, and might have been set aside by a court of equity. But certainly it was in the power of the directors to apply the subscription on bonds taken in payment to the extinguishment of debts, and, if thus applied in good faith, all being obtained for it that it was worth, no one has' been wronged. It is, therefore, a question of fact to be determined by the evidence, whether the bonds and the balance of the city’s subscription were thus applied. Upon this subject we have already remarked at considerable length. We may add the evidence is convincing that the contract between the city and the company was made in the utmost good faith, with no intention to wrong creditors of the latter; that it was at the time considered advantageous •to the company, and it is not proved that,all was not paid' for the bonds issued and to be issued that they could have been sold for in the market.
 

 We will not pursue this branch of the case further. Were it even conceded that the arrangement of August and September, 1857, might have been set aside at the instance of creditors of the company, the laches of the complainants is fatal to their bill. This suit was not brought until the 29th day of January, 1868. The contract assailed was consummated September 8,1857. It was not made in secret. There was no attempt at concealment. • On the contrary, the ordinance of the city was published at the time; The insolvency of the company, as well as its abandonment of its work on the railroad, was known. It is asserted in complainants’ bill. Injunction suits were then pending against the city.
 
 *107
 
 The return of
 
 nulla bona
 
 to the complainants’ execution against the railroad company was made on the first of December, 1858. Then their right, if any they had, to attack the compromise as fraudulent was perfect. Yet they remained inactive more than nine years, and it was not until-after a speculator had purchased a large part of the judgment that this bill was brought. An attempt has been made to excuse this long delay, by the testimony of one of the complainants that he had never heard of the compromise of the city’s subscription until a time which was subsequent to the commencement of the suit. But he does not say that he had not full possession of the means of detecting the fraudulent arrangement, if it was fraudulent, or that there had been any concealment; and the possession of such means of knowledge is, in- equity, the same as knowledge itself.
 
 *
 
 Moreover, the other evidence in the case is irreconcilable with this statement of the witness. He had attorneys who knew of the compromise from the first. He himself went to New Albany, in the spring of 1858, for the purpose of making a thorough examination of the affairs of the company, and another witness thinks he was then informed of the arrangement. There is not the slightest evidence that any other one of the complainants was not fully apprised of what had been done from the time of the transaction, and certainly they all had the fullest means of knowledge. No excuse is, therefore, shown for their long delay, and it is difficult to see why they are not barred by the rule in equity analogous to the statute of limitations. Upon this subject it is unnecessary to cite authorities. They are to be found in numbers in the decisions of this court, as well as elsewhere. It is not to be questioned that a direct suit at law, founded upon alleged fraud in making the compromise, would have been barred by the .Indiana statutory limitation of six years. It cannot be maintained that supine negligence and lapse of time are less efficient in a court of equity.
 

 These views of the case render it unnecessary to consider
 
 *108
 
 the other defences set up against the complainants’ right to recover.
 

 Decree reversed, and the cause remanded, with instructions to dismiss the complainants’ bill as against the city of New Albany.
 

 *
 

 4
 
 Wallace, 598.
 

 *
 

 Farnam
 
 v.
 
 Brooks, 9 Pickering, 212; 2 Story’s Equity, § 1521.