NORRIS *v.* HAGGIN and others.

*(Circuit Court, D. California.* August 4, 1886.)

1. EQUITY—STATUTE OF LIMITATIONS.

The rule established by the decisions of the supreme court, as to the effect of statutes of limitations in courts of equity, appears to be that, in those states where the statutes of limitations are made applicable to suits in equity, as well as to actions at law, and they embrace in terms the specific case, and in cases of concurrent jurisdiction, they are as obligatory, *as such,* upon the national courts of equity as they are upon the state court, and as they are in actions at law; and the courts of equity should act in *obedience,* rather than upon analogy, to them. But where they are not applicable to equity cases in the state courts, and there is not concurrent jurisdiction, and where the specific case is not covered in terms by the statute, then the time prescribed by the statute of limitations will ordinarily be applied by analogy, in accordance with the provisions most nearly analogous and applicable.

2. SAME—LIMITATIONS AS TO ACTION FOR FRAUD.

In providing for actions for relief on the ground of fraud, the legislature carried into the provision the principle established by courts of equity, that the cause of action shall not be deemed to have accrued until the "discovery *of the facts* constituting the fraud;" and to ascertain what conditions constitute a discovery, within the meaning of the provisions, the principles established in equity law, whence the idea was derived, must be applied.

3. SAME—DILIGENCE—MEANS OF KNOWLEDGE.
   The established principles as to the discovery of fraud are that the party defrauded must be diligent in making inquiry; that means of knowledge are equivalent to knowledge; that a clue to the facts, which, if diligently followed, would lead to a discovery, is, in law, equivalent to a discovery.

4. SAME—IMBECILITY FROM INJURIES AS AN EXCUSE FOR NON-ACTION.
   Conceding imbecility resulting from a serious injury upon the head to be a sufficient excuse for not discovering the facts constituting the frauds while such imbecility continues, the party must act as soon as his imbecility ceases, or he will be deemed to have the knowledge which he might have obtained by the exercise of proper diligence.

5. SAME—WHAT FACTS CONSTITUTE MEANS OF KNOWLEDGE, which the party is bound to pursue, pointed out, in a case where the title to large estates are alleged to have been fraudulently obtained by defendants.

6. SAME—MULTIFARIOUSNESS considered.

In Equity.
*J. H. McKune* and *C. L. White*, for complainant.
*Louis T. Haggin* and *Beatty & Denson*, for defendants.
Before SAWYER and SABIN, JJ.

SAWYER, J.  It is alleged in the bill that the complainant, in the year 1859, and thenceforth, till the title was divested in the years 1860, 1861, 1862, and 1863, in the manner set out, was the owner of several tracts of land in Sacramento city and county, including the Rancho del Paso, containing 45,000 acres, situate on the right bank of the American river, opposite the city of Sacramento, all of the aggregate value, in round numbers, of about a million and a half of dollars; that from 1855 till about 1868 the defendants were the trusted agents, business managers, and attorneys of complainant in the management of his business connected with said property; that on the fourth day of March, 1859, he received a severe blow on the head, which rendered him insensible for several days, and his nervous system was so shocked thereby that, for ten years thereafter, he was unable, and mentally and physically incompetent, to attend in person to his business affairs, or to comprehend what had been done in and about his business, or to direct his agents what to do, or how to act, in the premises, and, during all this time, he was wholly dependent on the said defendants for advice and action in his affairs, and the defendants assumed the full charge and management of his business; that, in violation of the trust and confidence thus reposed in them, defendants, during the year 1859, obtained a note and mortgage upon said property for a large amount, without his knowledge, and without proper consideration; that they foreclosed the mortgage in the following year, and purchased in the property; also that, during the years 1860 and 1861, they procured other judgments fraudulently to be obtained, had the property sold thereunder, and purchased in for their benefit, and ultimately conveyed to them, but these judgments were all subject to the prior liens of said mortgage; and, finally, that defendants, on June 23, 1863, while complainant

was still mentally incompetent, fraudulently procured, without consideration, a conveyance from him to all said lands, and all other lands owned by him in California, which conveyance was duly recorded on September 10, 1863, whereby the title to all complainant's property in California became vested in defendants; that defendants, on receipt of said several conveyances, in 1862, and under a writ of possession issued upon a judgment in an action of ejectment recovered thereupon, entered into possession, and they have ever since held possession, claiming under said titles, taking the rents and profits thereof without accounting to him. Complainant then alleges that he did not know anything about these fraudulent acts, the said note and mortgage, and the said several suits, judgments, and sales thereunder, or the said conveyances, or the effect thereof, until after July 1, 1884, and most of the facts he only learned from his solicitors in this suit on the twentieth, twenty-first, twenty-second, twenty-sixth, and twenty-seventh days of August, 1885. He alleges that in 1869 he applied to H. O. Beatty, who had in some early case been his attorney, for information concerning his affairs with defendants, and was advised by him that he could not act for him, as he had been employed by defendants; and as he was the only attorney then living who had knowledge of his affairs in connection with said *rancho,* and as he was ignorant of them himself, he could not communicate with strangers, so as to made himself intelligible, he felt compelled to accept the state of affairs as he found them, and took no further action.

Defendants demur on the grounds that the bill does not state facts sufficient to entitle the complainant to discovery or to relief; that the bill is multifarious; that the cause of suit is barred by the statute of limitations; and that the cause of suit is stale by reason of lapse of time.

In *Lakin* v. *Sierra Buttes Gold Min. Co.,* 25 Fed. Rep. 343, in discussing the question whether the defense of the statute of limitations was properly pleaded, I observed, perhaps with not sufficient consideration and caution, that "the statute of limitations, *as such,* is not a defense in a court of equity of the United States;" that "on the equity side of this court the only defense is laches in not pursuing the party's remedy for such time, and under such circumstances, as render it inequitable to grant the desired relief;" but that a "court of equity, in analogy to the statute of limitations, usually adopts the statute as a limit," etc. The observation was not necessary to the point decided, and it may be doubted whether this proposition, in the broad terms stated, is strictly accurate. While there are cases in the supreme court that seem to give support to the view as stated, there are others which, while recognizing staleness, irrespective of statutes of limitations, as a good defense in courts of equity, sustain the view that statutes of limitations are obligatory upon, and are enforced, as such, by the national courts of equity, without reference to the equitable doctrine of staleness, especially in those states where the statute

is made applicable in equity as well as at law, and in cases of concurrent jurisdiction.

Thus, in *Badger* v. *Badger*, 2 Wall. 94, the court says:

"Courts of equity, in cases of concurrent jurisdiction, consider themselves bound by the statute of limitations, which govern courts of law in like cases, *and this rather in obedience to the statutes than by analogy.* In many other cases they act upon the analogy of the like limitation at law."

So, in the *Case of Broderick's Will,* the court appears to have acted upon the idea that the statute of limitations is obligatory *as such.* Says the court, after considering another point:

"They would still have to encounter the *statute of limitations,* which expressly declares that the action for relief on the ground of fraud *can only be commenced within three years;* and the statutes of limitations in California *apply to suits in equity as well as actions at law.*" 21 Wall. 518.

So, in *Sullivan* v. *Portland, etc., R. Co.,* 94 U. S. 811, the court recognized the statute of limitations as a defense distinct from staleness, and refers to the defenses in both aspects, declining to consider the defense of the statute, because it was not pleaded. "The defense of the statute of limitations is not set up by plea, nor in the answers," says the court. "We cannot, therefore, consider the case in that aspect." Page 811. But as to the defense of staleness, it was held not to be necessary to set it up in the pleadings, and, as to that defense, it is said: "Sometimes the analogy of the statute of limitations is applied," thus recognizing the distinction between the defenses; the statute being a defense of itself, *as such,* to which effect is given in obedience to the statute, and the other, by adapting the statutory time by analogy.

In *Miller* v. *McIntyre,* 6 Pet. 66, the court says:

"From the above authorities it appears that the rule is well settled, both in England and in this country, that *effect will be given to the statute of limitations in equity the same as at law.*"

And in *Elmendorf* v. *Taylor,* 10 Wheat. 168, it is said:

"Although the statutes of limitations do not, either in England or in these states, extend to suits in chancery, yet the courts in both countries have acknowledged their obligation."

But in *Peyton* v. *Stith,* 5 Pet. 494, it is said:

"This would afford at law a complete bar to an ejectment under the title of Phillips, and courts of equity adopt the *same rule by analogy.*"

See, also, *Piatt* v. *Vattier,* 9 Pet. 415.

Upon a full consideration of the authorities, the established rule to be deduced from them appears to be that in those states where the statutes of limitations are made applicable to suits in equity as well as to actions at law, where they embrace in terms the specific case, and in case of concurrent jurisdiction, they are, in themselves, as obligatory upon the national courts of equity, as such, as they are upon the state courts, and as they are in actions at law, and the court should act in *obedience,* rather than *upon analogy,* to them;

but where they are not applicable to equity cases in the state courts, and there is not concurrent jurisdiction, or the specific case is not covered in express terms by the statute, then the statute of limitations will, ordinarily, be applied by analogy, in accordance with the provisions of the statute most nearly analogous and applicable. In this state there is a statute applicable to every case that can arise, and the statutes are as applicable to cases in equity as to cases at law, and the national courts of equity should, therefore, yield obedience and give effect to them as such. *Lord* v. *Morris*, 18 Cal. 486; *Grattan* v. *Wiggins*, 23 Cal. 34; *Hardy* v. *Harbin*, 4 Sawy. 548. But it can make little difference which theory is adopted, as the practical result is the same whether the court acts in obedience to the statute as obligatory upon it, or adopts the statute by analogy, in pursuance of the settled principles of equity law, and the long-established rules of equity practice, equally obligatory upon the courts.

In this case, according to the allegations of the bill, the deed by which the Rancho del Paso, and other property embraced in it, was conveyed to one of the defendants, in pursuance of the mortgage sale on the decree foreclosing the mortgage set out, was executed on November 12, 1862. The sheriff's deed in pursuance of the sale of the same property on the Grimm and Ross judgments was executed on April 2, 1862. In May or June, 1862, defendants took possession of the property so conveyed under a writ of possession issued upon a judgment in an ejectment suit brought upon the Ross title, and they have ever since been in possession, taking the rents and profits. On June 23, 1863, the complainant executed the deed to defendants described in the bill, purporting to convey the same property, and *all other lands* owned by him in the state of California, which deed was duly recorded on September 10, 1863; and no specific act of confidence or agency appears to have been performed by defendants after that date. These facts appear to be inconsistent with the general loose allegation that the agency continued till 1868. Thenceforth they were, manifestly, in a hostile position. This bill was filed August 31, 1884, more than 22 years after defendants had taken adverse possession of the property under the said conveyances, and under the judgment recovered thereon in ejectment, and more than 21 years after the said deed of June 23, 1863, which seems to have been intended to cure any defect that might exist in the title before acquired under the several judgments and sales set out.

The longest period allowed in any case between private parties by the statute of limitations of California for commencing an action, after the right accrues, is five years, and that period had run more than four times over, before this bill was filed. Unless, therefore, the case can be brought within some exception of the statute, the suit is barred. The only exception, if any, that can reach the case, or is claimed to reach it, is found in section 338, Code Civil Proc. subd. 4, which provides that the period shall be *three* years in case of "an

action for relief on the ground of *fraud* or mistake; the cause of action in such case not to be deemed to have accrued until the discovery by the aggrieved party of *the facts constituting the fraud*." The English statute of limitations, from which the American statutes were originally derived, applied only to actions at law, and did not embrace this provision; and, in providing for actions for relief on the ground of fraud, the legislature carried into the provision the doctrine, as established in courts of equity, that the cause of action should not be deemed to have accrued until "the discovery of the facts constituting the fraud." *Wood* v. *Carpenter*, 101 U. S. 139.

To ascertain of what acts a discovery of the facts constituting the fraud affording the ground for relief consists, we must go to the principles established in equity law, whence the idea was derived. The settled principles on this point are that the party defrauded must be diligent in making inquiry; that the means of knowledge are equivalent to knowledge; that a clue to the facts which, if followed up diligently, would lead to a discovery, is, in law, equivalent to a discovery,—equivalent to knowledge. In stating the policy of statutes of limitations, and in illustrating these principles of construction applicable thereto, Mr. Justice SWAYNE, speaking for the court in *Wood* v. *Carpenter, supra,* together with much more to the point, said:

"Statutes of limitation are vital to the welfare of society, and are favored in the law. They are found and approved in all systems of enlightened jurisprudence. They promote repose, by giving security and stability to human affairs. An important public policy lies at their foundation. They stimulate to activity, and punish negligence. While time is constantly destroying the evidence of rights, they supply its place by a presumption which renders proof unnecessary. Mere delay, extending to the limit prescribed, is itself a conclusive bar. The bane and antidote go together. * * * It will be observed, also, [he adds,] that there is no averment that, during the long period over which the transactions referred to extended, the plaintiff ever made, or caused to be made, the slightest inquiry in relation to either of them. The judgments confessed were of record, and he knew it. It could not have been difficult to ascertain, if the facts were so, *that they were shams.* The *conveyances* to Alvin and Keller *were also on record in the proper offices.* If they were in trust for the defendant, as alleged, *proper diligence could not have failed to find a clue in every case that would have led to evidence not to be resisted. With the strongest motives to action, the plaintiff was supine. If underlying frauds existed, as he alleges, he did nothing to unearth them. It was his duty to make the effort.* * * * The discovery of the cause of action, if such it may be termed, is thus set forth: ' And the plaintiff further avers that he had no knowledge of the facts so concealed by the defendant until the year A. D. 1872, and a few weeks only before the bringing of this suit.' There is nothing further upon the subject. * * * ' *Whatever is notice enough to excite attention, and put the party on his guard, and call for inquiry, is notice of everything to which such inquiry might have led. When a person has sufficient information to lead him to a fact, he shall be deemed conversant of it.*' *Kennedy* v. *Green,* 3 Mylne & K. 722. ' *The presumption is that if the party affected by any fraudulent transaction or management, might, with ordinary care and attention, have seasonably detected it, he seasonably had actual knowledge of it.*' Ang. Lim. § 187, and note. A party seeking to avoid the bar of the statute on account

of fraud must aver and show that he used due diligence to detect it, and, if he had the means of discovery in his power, he will be held to have known it. *Buckner* v. *Calcote.* 28 Miss. 432, 434. See, also, *Nudd* v. *Hamblin*, 8 Allen, 130. \* \* \* Concealment by mere silence is not enough. There must be some trick or contrivance intended to exclude suspicion and prevent inquiry. There must be reasonable diligence, and the means of knowledge are the same, in effect, as knowledge itself. He does not say that he had not full possession of means of detecting the fraudulent arrangement, if it was fraudulent, or that there had been concealment, and the *possession of such means of knowledge is, in equity, the same as knowledge itself.*" *New Albany* v. *Burke*, 11 Wall. 107.

Says the court in *Badger* v. *Badger*, 2 Wall. 95:

"There is a general allegation that the fraudulent acts were unknown to complainant till within five years past, while the statement of his own case shows clearly that he must have known, *or could have known*, if he had chosen to inquire at any time in the last thirty years of his life, every fact alleged in his bill."

See, also, *Oliver* v. *Piatt*, 3 How. 410; and there are numerous other authorities to the same effect.

Apply these indisputable principles to the facts alleged in the bill. The relief sought is on the ground of fraud imputed to defendants, by means of which they are alleged to have secured a large amount of property belonging to complainant without consideration. The suit is barred in three years after discovery of the facts constituting the fraud. If the acts of fraud were discovered, or acts which, if diligently investigated, would necessarily have led to the discovery, in 1862 or 1863, after the defendants had gone into adverse possession, and obtained their final confirmatory deed, the statutory period had run more than seven times before the filing of the bill. If this knowledge came to complainant in 1869, after his alleged mental and physical incompetency had disappeared, then fifteen years had elapsed, and the statutory period had run five times.

There are loose general allegations in the bill that complainant did not discover that defendant intended to cheat or defraud him, or that they had any interest in the proceeds of said sales, or had any knowledge of the said deeds, the judicial proceedings, etc., through which he was divested of his title, and did not know their contents, till 1884, and much of them till certain days in July, 1885, when these facts were first disclosed to him by his attorney in this case,—allegations "that he never knew or suspected that defendants had any interest in said transactions \* \* \* until advised thereof by his present solicitors, early in 1884." And, to account for this remarkable want of knowledge, he alleges that in 1859 he was injured by a blow on the head; and in one paragraph "that, for two years next after his said injury, your orator was wholly unable to comprehend his business, and did not attempt to digest or to comprehend any matter of business submitted by or from the office of defendants;" and in another paragraph that, in consequence of said injuries, "for more than ten years thereafter he was unable, mentally and physically incom-

petent, to attend in person to his business affairs, or to comprehend or understand what had been done in and about his said business, or to direct his agents what to do, or how to act in the premises." These general allegations must be considered in connection with other specific allegations of the bill.

In Story's Equity Jurisprudence it is said:

"The question often arises in cases of fraud and mistake, and acknowledgments of debt, and of trusts, and charges on lands for payment of debts, under what circumstances, and at what time, the bar of the statute of limitations begins to run. In general, it may be said that the rule of courts of equity is that the cause of action or suit arises when and as soon as the party has a right to apply to a court of equity for relief. In cases of fraud or mistake, it will begin to run from the time of the discovery of such fraud or mistake, and not before. But to excuse one from instituting proceedings in equity on the ground of the cause of action having been concealed, *it is not sufficient to show that the party was in such an imbecile or uncultivated condition of mind that it was scarcely possible, though the alleged fraud was by an open act, that he should have discovered it. The court cannot undertake to estimate the chance which the state of mind and education of a man may afford of his making such a discovery, and is therefore compelled to assume that every one, not actually a lunatic, is competent to judge of and to obtain advice concerning his rights, and to assert them, if necessary.*" Section 1521a.

The statute of California expressly points out all the disabilities that excuse delay, beyond the time limited, in the bringing of a suit, and the incompetency alleged in the bill is not one of them. Code Civil Proc. §§ 350–363; especially section 352. No other can be interpolated into the statute. But concede, for the purpose of this case, that the incompetency alleged, resulting from complainant's injury, to be a sufficient excuse for his failure to discover the facts while that incompetency existed. The bill is not verified by the oath of complainant, and its allegations must be presumed to have been made as favorable to the pleader as the facts would justify. Upon these allegations the incompetency only continued for 10 years, at the longest. It consequently disappeared in 1869. One paragraph alleges it at two years, but another at ten, and we cannot presume that it continued longer than alleged. The latter is the longest stated. Taking the view most favorable to complainant, there intervened between the restoration of his competency to comprehend and take care of his business, in the year 1869, and the year 1884, when the bill was filed, a period of fifteen years, or time enough for the statute to run five times over. He does not tell us what he was doing all this time. During all that time he *knew* that in 1859 he owned the Rancho del Paso, containing 45,000 acres of land. He knew that he owned lot 6, with its improvements, in the city of Sacramento, worth, as he alleged, $75,000. He knew that he owned the toll-bridge, ferry, and appurtenances over the American river, and other property, all of the alleged value, in the aggregate, of a million and a half of dollars. He knew that defendants were during all that time in possession,

and receiving the rents and profits, claiming to own the lands, or he might have known that they claimed to own it; for "the possession of land is notice of a claim to it by the possessor. Sugd. Vend. 753, 754. If not taken and held by contract or purchase, it is, from its inception, adverse to all the world, and in twenty years bars the owner, in law and equity. *Green* v. *Liter*, 8 Cranch, 250; *Barr* v. *Gratz*, 4 Wheat. 221; *Clarke's Lessee* v. *Courtney*, 5 Pet. 354." *Boone* v. *Chiles*, 10 Pet. 223, 224.

Besides, their possession, control, and claim of ownership of these valuable properties was so notorious as to become a part of the public history of the state, and of the common knowledge of the people. He knew that the title, having been in himself once, must be in himself still, or must have got out of him into the possession of claimants in some mode; and that, under the laws of the state, that mode must, necessarily, be a matter of public record, easily accessible to him, and to all the world. He might, at least, have demanded possession, and asked by what right he was kept out of his own. He might have brought a suit in ejectment, and compelled defendants to show their title, and how derived from him, if any such title they had; or he might have filed his bill of discovery, as he has now done, at last, in this suit, to ascertain by what right the defendants claimed to withhold his property from him. In the language of Mr. Justice SWAYNE in *Wood* v. *Carpenter, supra*, it does not appear from the averments of the bill that complainant *"ever made, or caused to be made, the slightest inquiry"* as to how he had become divested and despoiled of his large estates. "The judgments" under which the sales were made were of record, and he knew it, or he might have known it; for each conveyance under which defendants claimed title from him was of record, and recited, necessarily, the judicial proceedings under which they were executed; and he had only to look to the public records for conveyances from Samuel Norris to find all the deeds mentioned in the bill, and all the judgments referred to in the deeds and in the bill. *"It could not have been difficult to ascertain, if the facts were so, that they were shams."* If they were frauds on the complainant, *"proper diligence could not have failed to find a clue, in every case, that would have led to evidence not to be resisted. With the strongest motive to action, the plaintiff was supine. If underlying frauds existed, as he alleges, he did nothing to unearth them. It was his duty to make the effort." Wood* v. *Carpenter*, 101 U. S. 139, 140.

The fact affirmatively appears that as early, at least, as 1869, 15 years before the filing of his bill, complainant's attention was, in fact, called to these matters; for he alleges that in the year 1869 he applied to H. O. Beatty, who had in some early cases been his attorney, for information concerning his affairs with defendants, and was advised by him that he could not act for him, as he had been employed by defendants. Thus, according to the allegation of the bill, his attention was, in fact, drawn to the subject, and this reply of his attorney

should have aroused his suspicions. It would arouse the attention of any careful man, or any man of the most ordinary intelligence. It shows, also, that as early as 1869 his mental condition was such as to enable him to comprehend the situation, and that his affairs were the subject of intelligent consideration with him. The only reason given for not pursuing the investigation is that said Beatty was the only attorney then living who knew anything about the matter, and he could not himself put other attorneys in possession of the facts, for the reason that he did not know them himself. But he did not need to know anything beyond the fact that he once owned this property, and that these defendants were now in notorious wrongful possession, claiming title by some means which must have come through himself. With this information, the veriest tyro in the profession, or any non-professional man of ordinary intelligence, without the slightest difficulty, would have been able to unearth these frauds, if any existed, and bring them to light. Even now, according to the allegations of the bill, complainant obtained all his knowledge of the facts from strangers, from his solicitors, and not his solicitors from him. And his solicitors could have had no personal knowledge, and are not claimed to have had any, except such as is open to all men; for Beatty is alleged to have been the only attorney in 1869 then living who had any information as to his affairs.

If the allegations of this bill be true, it discloses one of the most remarkable and incomprehensible instances of a want of attention to one's own highest interests ever presented to a court of justice. With ample means of information at his command, to guide him to the truth, he made no effort to ascertain it for nearly a quarter of a century after the defendants had obtained a title to all this property, and placed themselves in an adverse and hostile attitude. Even if he was not in a sufficiently healthy mental and physical condition to attend to his affairs for 10 years after the performance of the acts complained of, there is nothing to indicate that he was not wholly competent during the following 15 years immediately preceding the filing of the bill. That he appeared in the foreclosure suit—the principal suit complained of—is plain; for it is alleged to have been commenced in the state court, and removed to the United States circuit court; and it could only have been so removed under the act of 1789, then in force, by the defendant himself in the suit, and upon his appearance in the case, and he must have appeared by solicitors, and obtained his removal, through their action. In our judgment the complainant appears, from the allegations of the bill, to have had such knowledge as would have enabled him, by the use of the slightest diligence, to ascertain all the facts constituting the frauds charged, if any such there were, and that it is his own fault if he did not inform himself of the true condition of his affairs. He must therefore be deemed to have had knowledge of the facts constituting the fraud for at least 15 years before the filing of this bill. The fact that the

complainant once owned these valuable properties; that he had intrusted them to the management of these defendants; that they were now in adverse possession, claiming to own them, receiving for their own use and benefit all the rents and profits; the fact, if it be a fact, that complainant had received no consideration for them; and the fact that any conveyance from him must necessarily have been matters of public record, and they are alleged to have been, in fact, of record,—were necessarily known to complainant. In the language used in *Manning* v. *San Jacinto Tin Co.*, 7 Sawy. 432, S. C. 9 Fed. Rep. 726, equally applicable to this case:

"They are such facts as must necessarily have put the complainant * * * upon inquiry, and have long ago led to the discovery of the frauds. They were facts which they were bound to notice, if they did not do so in fact. They furnish a clue which, if followed with reasonable diligence, would not require fifteen years to lead to the fraudulent acts of the parties charged. * * * Certainly, the known facts were sufficient to arouse suspicion, and enable the complainant to file a bill of discovery * * * long ago. * * * Parties cannot disregard known facts that lead to frauds affecting their rights, and, in the language of Mr. Justice BRADLEY, 'then claim exemption from the laws that control human affairs, and set up a right to open up all the transactions of the past. The world *must move on*, and those who claim an interest in persons or things must be charged with knowledge of their *status* and condition, and of the vicissitudes to which they are subject. This is the foundation of all judicial proceedings *in rem.' Broderick's Will*, 21 Wall. 519. It must not be forgotten, not only that the world ' moves on,' but that in this age and country it moves rapidly. Three years now, and especially in California, is longer in events and progress than twenty years some centuries ago, when the statutes of limitations were adopted in England. Parties cannot lie down to sleep on their rights, and, on waking up many years afterwards, find them in the same condition as that in which they were left. The observations of the chief justice in *Vance* v. *Burbank*, 101 U. S. 520, are not inappropriate to this case. Among other things, he says, with reference to the facts of that case: ' If any was in fact not sent forward, and Scott did not discover the omission until one year of the time of the commencement of this suit, he must have been grossly neglectful of his own interests.' The same may be said of the complainant in this case. If the open, known, notorious facts suggested in the bill, and apparent upon the public records of the county, did not, in fact, put the complainants * * * upon inquiry, and lead them to a discovery of the frauds charged, at least sufficiently to afford as good a basis upon which to file a bill of discovery, containing general and sweeping charges, * * * as that upon which the present bill rests, they must, indeed, ' have been grossly neglectful of their own interests.' "

In our judgment the suit is barred by the statute of limitations, and, without reference to the statute, the claim is stale within the principles of equity jurisprudence on that subject. It is manifest that the bill cannot be truthfully amended so as to remove the objection. The demurrer must therefore be sustained on the grounds indicated, and the bill dismissed.

We do not think the bill multifarious. Although there are different and separate acts complained of, they are all alleged to be in violation of the same duties and trusts, and all relate to the same lands,

and constitute different means by which title is obtained to the same property. Besides, the deed of 1863, which was probably intended to perfect the title, by covering any defects that might be found in the prior proceedings, embraces all the property to which the bill relates, and it affords a common point for litigation.

Let there be a decree dismissing the bill.