## CARTER v. UNION PRINTING COMPANY.

Decided June 13, 1891.

*Corporation—Release of subscription.*

> A voluntary release of a stock subscription by an insolvent company is a fraud upon its creditors, whether their claims arose before or after the stock was issued.

APPEAL from *Pulaski* Chancery Court.

DAVID W. CARROLL, Chancellor.

*Morris M. Cohn* for appellant.

1. The judgment against the company is binding on the stockholders. Morawetz on Priv. Corp. (1st ed.), sec. 619; Thomp. Liability Stock., sec. 329.

2. The wrecking of the company by McMurtry and his associates, while they were directors and officers, made them iable in damages to its creditors. Mansf. Dig., sec. 984; 42 N. W. Rep., 926; 20 Fed. Rep., 181; 13 Pac. Rep., 161; 7 Atl. Rep., 514.

3. Capital *paid in* means *cash*, under secs. 968–971, Mansf. Dig.; 91 U. S., 60; 17 Ohio St., 187; 1 McCrary, 92; 69 Pa. St., 334; 44 Barb., 625.

4. But if the stock could be paid for in property, it should have been shown to be actually worth the amount subscribed. Const., art. 12, sec. 8; Morawetz (ed. 1882), sec. 374; note to 31 Fed. Rep., 676; Green's Brice's Ultra Vires (Am. ed. 1880), 142; 20 N. W. Rep., 764–7; 59 Md., 599, 604; 69 Pa. St., 334; Bates, Lim. Part., secs. 47, 48, 54; 47 N. Y., 225.

5. The arrangement between the corporation and the stockholders could not relieve McMurtry from paying his stock, at the expense of the creditors. And this does not depend upon insolvency. 91 U. S., 56; *ib.*, 47; *ib.*, 69; 103, *id.*, 508; Taylor, Corp., sec. 545; Angell & A., Corp., secs. 600, 603; Boone, Corp., sec. 112; Mor. on Corp., secs. 109, 112, 781, 824; 1 McCrary, 96; 59 Md., 599; 47 N. Y., 225, 232; Wait, Fr. Conv., sec. 369.

6.  The company could not cancel unpaid stock, or buy it in after insolvency at the expense of creditors.  Mansf. Dig., sec. 981; Wait, Insolv. Corp., sec. 582; Morawetz (1st ed.), sec. 589; Boone, Corp., sec. 141; Thompson, Liability of Stock., sec. 205; 91 U. S., 56, 60, 61; 103 U. S., 498; 54 Md., 429; 35 N. J. Eq., 501; 20 Md., 764; 57 Miss., 602.

7.  Insolvency and fraudulent conveyance may be proved by circumstances.  95 U. S., 6; *ib.*, 22; 50 *id.*, 314; *ib.*, 42; Pom. Eq. Jur., vol. 2, sec. 973, p. 511; The doctrine as to increase of stock is the same.  *Ib.;* Morawetz on Corp., sec. 831; 37 Md., 522.

8.  One stockholder may be sued.  22 How., 380; 101 U. S., 205; 114 Pa. St., 153; 12 Or., 322; Thompson on Liability of Stock., secs. 354–5–7.

*House & Cantrell* and *Sanders & Watkins* for appellee.

1.  A corporation has the power to purchase its stock where there is no fraud.  In this case the stock was not merged or reduced.  Cook on Stock, etc., sec. 311; 11 Wall., 96; 2 Morawetz, Corp., sec. 841; Thompson on Liability of Stock., sec. 134; 6 Cent. L. J., 109; 114 Mass., 37.

2.  The unpaid subscription of a stockholder, when his stock is subscribed and issued after the debt is contracted, is not a trust fund for the benefit of such creditor, because he does not contract upon the faith and credit of such stock.  2 Morawetz, Corp., secs. 832, 833; 44 N. W. Rep., 198; 42 Minn., 327; 119 U. S., 343.

3.  Stock can be paid for in property such as is necessary to carry out the object and purpose of the corporation.  Cook on Stock, etc., sec. 13; 27 Penn. St., 416; 6 Cent. L. J., 109; Mansf. Dig., sec. 973.

4.  Insolvency is not alleged nor proven.

HEMINGWAY, J.  In February, 1886, the Union Printing Company was organized as a corporation with a paid capital stock of $10,000.  In June following its stock was increased to $30,000.  Munro and Van Valen subscribed for $15,000 of the new stock and McMurtry for the remainder,

they having given to him $3500 of their own to induce him to take his. He paid on the stock for which he subscribed $3530, and bound himself to pay the balance, $1470, on call. He became the president of the company, and continued as such until the 2d of September following, when his resignation was tendered and accepted. On the same day the following proceedings are shown by the minutes of the directors' meeting, to-wit:

"CALLED MEETING OF THE BOARD OF DIRECTORS.

"LITTLE ROCK, ARK., September 2, 1886.

" At a meeting of the board of directors of the Union Printing Company, called by direction of the president and held at its place of business, on the 21st day of September, 1886, the following named directors were present: J. Erb, F. L. Munro and J. M. Wade.

" President A. McMurtry being absent, the vice-president took the chair, and called the meeting to order. The reading of the minutes of the previous meeting was dispensed with. The following was read, and, upon motion of Mr. J. Erb, was unanimously adopted:

" WHEREAS, There has heretofore been issued to A. McMurtry certain stock in this corporation amounting to $8500, upon which the sum of $5000 purports to have been paid thereon, but in fact there has been but the sum of $3530 paid thereon, and leaving the sum of $1470 due and unpaid, and which was to be paid at the time of issue; and,

" WHEREAS, The said McMurtry now fails and refuses to make such payment, but has offered and agreed to accept the sum $3530 as purchase of said stock; and,

" WHEREAS, This corporation is in need of immediate funds, and can resell the said stock so as to realize the sum of $1470;

" *Now, therefore,* The said offer of said McMurtry is hereby accepted, and the president of the corporation is authorized and empowered to buy said stock and have the same transferred to the corporation, * * * not for the pur-

pose of retiring the same, but for the purpose of reissue and resale for the benefit of the concern. And the said president is hereby authorized and fully empowered to enter into, on the part of the company, such contract and negotiations, and to make such securities, by mortgage of property of the concern, as will secure to the said McMurtry the purchase price of said stock and will perfect the purchase of said stock, and to do and perform all such matters and things as in his judgment may be necessary to carry out the purpose of this resolution.

" WHEREAS, This corporation is in need of money to meet certain liabilities due therefrom ; now, therefore, be it

" *Resolved,* That the president of this corporation be and he is hereby authorized and fully empowered to borrow of any one who is willing to lend the same the sum of $1470, and to execute to such lender the obligation of this company, and to procure any and all securities, personal or otherwise, or to make a mortgage upon the property of this company, in such way and manner as may to him, the said president, seem right and proper, to secure the said loan."

In pursuance of these resolutions the company borrowed $1470 from R. C. Lynch, a brother-in-law of McMurtry, and executed to Lynch and McMurtry's representatives, he having died, a mortgage on all its property to secure the sum so borrowed, as well as the amount agreed to be paid to McMurtry.

About the time when the company was organized, the plaintiff entered into a contract with it whereby it became bound to pay him for service to be rendered. He subsequently brought suit for a breach of that contract, and on the 28th of November, 1888, recovered judgment in the sum of $1344.20. Execution was issued on the judgment and returned *nulla bona,* whereupon this suit was brought for the purpose—among others—of requiring McMurty's representatives to pay to plaintiff a sufficient part of the amount unpaid on his stock to satisfy the judgment.

It appears that on the original stock of $10,000 no cash was paid. The incorporators owned a lot of printing presses and material, and this was contributed in payment for the original stock. The property contributed had been purchased for $3000, of which a balance of $2000 was unpaid and secured by mortgage on the property. Before this suit was brought a suit had been instituted wherein a decree was rendered for the sale of the company's property under the two mortgages above referred to ; a sale was had and a sum realized insufficient to pay the first mortgage. Upon the hearing in this case the chancellor dismissed the bill, and the plaintiff has appealed.

**When corporation cannot release stock subscription.** In design and effect, the transaction between McMurtry and the company amounted to an agreement for a cancellation of his stock subscription by returning to him what he had paid in and releasing him from liability for unpaid installments. We proceed to inquire whether the company had the right, as against its creditors, to release him from his liability. If it had not this right, the plaintiff is entitled to recover the amount of such liability; and as counsel stated in the argument that it was sufficient to satisfy his claim, we may waive other questions discussed. The creditors of a corporation have a right to look to its property for the payment of their claims, and to object to any disposition of it in fraud of their rights; and this right extends as well to claims due it as to its property in possession. Upon this question the Supreme Court of the United States has used the following language: "The capital stock of an incorporated company is a fund set apart for the payment of its debts. It is a substitute for the personal liability which subsists in private co-partnerships. When debts are incurred, a contract arises with the creditors that it shall not be withdrawn or applied, otherwise than upon their demands, until such demands are satisfied. The creditors have a lien upon it in equity. If diverted, they may follow it as far as it can be traced, and subject it to the pay-

ment of their claims, except as against holders who have taken *bona fide* for a valuable consideration and without notice. It is publicly pledged to those who deal with the corporation, for their security. Unpaid stock is as much a part of this pledge, and as much a part of the assets of the company, as the cash which has been paid upon it. Creditors have the same right to look to it as to anything else, and the same right to insist upon its payment as upon the payment of any other debt due to the company. As regards creditors, there is no distinction between such a demand and any other asset which may form a part of the property and effects of the corporation." *Sanger* v. *Upton,* 91 U. S., 56, 60, 61.

That the rule announced is correct, is not controverted; but counsel argue that it does not apply to this case. The reason assigned for their contention is that plaintiff's debt was contracted before the stock was increased, and they argue, as a correct legal proposition, that the unpaid subscription of a stockholder is not held as a fund for the benefit of those creditors whose claims arose prior to the issuance of the stock and without reference to or reliance upon it. They cite several cases in support of the rule contended for, but we do not think they go to the extent claimed. In those cases the corporations had parted with the stock upon terms that gave them no claim against the subscribers, and it was held that if a corporation issue new shares of stock after the claim of a creditor arose, he, not having dealt with the company on the faith of any capital represented by such shares, can not insist on the contribution, by the holders, of a greater amount of capital than the corporation itself could claim from them. *First National Bank* v. *Gustin, etc. Co.*, 42 Minn., 327. But they further hold that if a stockholder were indebted to a corporation for unpaid installments of stock, this claim would be an asset of the company which, in case the company became insolvent, any creditor might resort to for the purpose of satisfying his demand. *Ib.; Coit* v. *Gold Amalgamating*

*Co.,* 119 U. S., 343. The distinction is illustrated in the case of *New Albany* v. *Burke,* 11 Wall., 96–106, where the court sustained a release of a claim for subscription, and Judge Strong, in delivering the opinion, said : "No doubt the subscribed capital stock of a corporation is a fund held by it in trust for its creditors, as is also all its other property ; and had the railroad company released without equivalent consideration, or given it away, its action would have been fraudulent and might have been set aside by a court of equity." So we think the plaintiff may attack the release, if it was fraudulent ; and that conclusion brings us to the next inquiry.

Was the company in such a condition financially as would entitle it to make a voluntary release of this claim as against its creditors ? If so, it could have made any other voluntary disposition of an equal amount of its property. As we view the evidence, it was not in a position to bestow bounty upon anyone. It began business without a surplus, and had continued it without accumulation. For its original stock of $10,000 it took a lot of mortgaged second-hand printing presses and machinery at three times its former cost, charged with a lien for two-thirds thereof. Upon an increase of its stock, a subscriber who paid in property of questionable value gave $3500 of his stock to induce McMurtry to subscribe for $5000 of the stock, and pay $3530 in cash on his subscription. The minutes of the directors' meeting show that the company was in such financial straits that it was willing to release a claim for $1470 and mortgage its property for $3530 in order to acquire $8500 of its stock, and by sale of it realize $1470. These circumstances clearly foreshadow the ultimate sale of its effects for a sum less than the paramount lien. If not absolutely insolvent, it was seriously embarrassed ; and any gift of its property was prejudicial to its creditors. It is earnestly insisted that we should not determine this cause upon the ground of the company's insolvency when the release was made, because there was no allegation of such

insolvency in the complaint.   The complaint alleged that there was an unpaid balance upon McMurtry's subscription, and this was denied by the defendant.   The proof clearly shows that there was an unpaid balance unless it was released by the transaction of September 2, and upon it the defendant must rely.   To overcome the force of the defense, the plaintiff was at liberty to make any proof which tended to show that the release was invalid, among others that it was executed in fraud of the company's creditors; and of this fact we think the proof is conclusive.

But it is contended that the transaction was not prejudicial to the company's creditors, because, while it gave up a claim against McMurtry, it obtained an equivalent sum of money from Lynch.   The reason assigned does not, it seems to us, justify the conclusion.   In the first place the loan from Lynch was an independent transaction with a different person, and has no bearing upon the arrangement with McMurtry; but in the next place, if the money had been advanced by McMurtry, it could not change the result, for it was advanced and received as a loan, and not in payment of a liability.   The company's note, secured by mortgage upon its property, was given for it, and a decree of foreclosure subsequently rendered upon it in a suit to which McMurtry's representatives were parties.   Having been treated as a loan, and charged upon the company's property, first by mortgage and afterwards by decree, it is now too late to contend that it was a satisfaction of McMurtry's liability.

That the result will entail a hardship upon McMurtry's estate is probable; but that is not a consideration in determining the questions presented.   The result flows, by the provisions of law, from his relations with the company, and courts could not, if they would, change or restrain the effect of such provisions, designed as a protection to those dealing with corporations.

The judgment will be reversed, and a judgment rendered here for the amount of plaintiff's debt, with interest and the cost of the action at law, provided it does not exceed the

sum of $1470 with interest thereon at 6 per cent. after the bringing of this suit; in such event the recovery will be limited to the amount last stated.