GERMAN SAVINGS BANK OF DES MOINES, IOWA, Appellant, v. DES MOINES NATIONAL BANK OF DES MOINES, IOWA.

**Banks: LOAN TO CASHIER.** Under Chapter 60, Acts of the Fifteenth General Assembly, a loan by a bank to its cashier not specifically passed upon by the board of directors was illegal, although a general resolution of the board authorizing loans to its officials had been adopted.

**Ratification.** Where notes given a bank by its cashier in his individual capacity and as treasurer of a company were sold by

VOL. 122 Iowa—47.

the cashier and the proceeds received and retained by the bank, it thereby ratified the transaction.

**Unauthorized Act of Cashier:** LIABILITY OF BANK. Where a cashier in his individual capacity and as treasurer of a company executes notes payable to his bank and thereafter transfers and renews the same with the guaranty of his bank, the purchaser is charged with notice that the cashier could not deal with himself individually nor as treasurer of a company, and could not therefore recover on the guaranty.

**Fraud:** DISCOVERY: RELIEF. A party asking relief on the ground of fraud must aver and show diligence in detecting it, and where the means of discovery were at hand it is equivalent to a knowledge of the fraud, and if the remedy is not sought within a reasonable time after the fraud ought to have been discovered the relief will be denied.

*Appeal from Polk District Court.*—HON. S. F. PROUTY, Judge.

FRIDAY, FEBRUARY 12, 1904.

ACTION on account of money alleged to have been obtained by fraud. Decree for defendant. The plaintiff appeals.—*Affirmed.*

*Dowell & Parish.* for appellant.

*Chas. L. Powell* and *Read & Read* for appellee.

LADD, J.—Prior to January 19, 1897, J. W. Geneser was cashier of the German Savings Bank of Des Moines. He had borrowed money of the bank both individually and for the Capital City Oatmeal Company, of which he was treasurer. The transactions by which these loans were originally made are not disclosed by the record. For the purposes of this case, their validity is not questioned, for the reason that the bank received and retained their full value when discounted to the Des Moines National Bank. There were originally four notes—one of the oatmeal company executed by Geneser, as treasurer, to the savings bank, for $4,500, and by him, as cashier, sold to the national bank November 24, 1894; one individual note of Geneser to the savings bank for $4,900, and sold by him, as cashier, to the national bank April 10, 1895; and two of his notes, one of $1,240, and the

other for $1,500, to the savings bank, and sold by him, as cashier, to the national bank May 9, 1896. The oatmeal company note was renewed six times prior to October 10, 1896, by Geneser, as treasurer; the new notes being indorsed or guaranteed by him as cashier of the savings bank. Some days later a note bearing that date was given for the same amount directly to the national bank. The individual note of Geneser was renewed several times, when one bearing the date October 10, 1896, for a like amount, was given directly to the national bank. The other two notes were consolidated into a note of $2,740 to the savings bank, and retained by the national bank. Probably each renewal note was not accompanied with a letter of guaranty, for some time in 1895 a general guaranty was executed by Geneser, as cashier of the savings bank, by the terms of which it guaranteed the payment of notes discounted or which might be discounted in the future to the national bank, and their renewals to either bank upon demand. On January 18, 1897, all these notes were renewed, and new notes given on blanks of the savings bank, for like amounts, payable in three months; and on the following day Blackburn was elected cashier of the latter, instead of Geneser, who was chosen vice president. On the evening of January 20th a committee of the directors of the savings bank, assisted by the president of the national bank, examined the books and papers of the former, and reached the conclusion that it was insolvent. Thereupon the president, acting for the national bank, demanded the immediate payment of these and other notes discounted to it, and was given a check of $34,140 on the savings bank, which was credited against its deposit in the national bank. Thereupon all the discounted notes, including those executed January 18, 1897, were delivered to the cashier of the former. The plaintiff insists it was under no obligation to take up the notes of Geneser individually and as treasurer, and that payment was procured by falsely representing that they were obtained by discount and indorsement in the ordinary course of business.

I. At the second meeting of the board of directors of the savings bank, March 7, 1893, a resolution was spread upon its records "that the managers of the bank be and they are hereby authorized to make loans to the members of the board of directors, including the president and cashier of the bank direct, and on their indorsement the same as other persons." The bank was then left in practical control of the cashier, who, notwithstanding the prohibition of the statute, proceeded in that capacity to deal with himself, individually and as treasurer of the oatmeal company, "the same as other persons." Under section 17 of chapter 60, page 52, of the Acts of the Fifteeth General Assembly, "all loans made to said trustees, officers, servants and agents of the bank shall be upon the same security [as] required of others, and in strict conformity to the rules and regulations of the bank; and all such loans shall be made only by the board, and shall be acted upon in the absence of the party applying therefor." Practically the only change from this in the present statute is the requirement that the action of the board be spread upon the records. See section 1869 of the Code. The manifest purpose of the law is to prohibit any loan to an officer of the bank unless that particular loan had been passed upon by the board of directors. Every such loan is to be separately considered, and the propriety of making it determined by the board, independently of any action on the part of the applicant. He is excluded from its deliberations in order to insure freedom of inquiry and discussion. Even with these safeguards, the influence of intimate association is often more potent than business discretion. Indeed, the confidence ordinarily reposed in the managing officers of a bank both by directors and the public is such that to permit a loan of its money, or that due depositors, to them, under any circumstances, seems of doubtful propriety. It is the most frequent cause of failure, and the occasion of great loss to patrons whose deposits many times exceed the capital stock of the bank. But it is enough now to say that any loan to an officer of the bank not passed upon by

*2. LOAN to cashier.*

the board of directors was illegal, and a blanket resolution like that adopted will afford no protection. Whether this would be true without the statute, see *West St. Louis Savings Bank v. Shawnee County Bank,* 95 U. S. 557 (24 L. Ed. 490); Zane on Banks & Banking, section 107; *Claflin v. Bank,* 25 N. Y 293; *Lee v. Smith,* 84 Mo. 309 (54 Am. Rep. 101).

II.    But the original notes by the cashier, individually or as treasurer of the oatmeal company, were endorsed by him as cashier of the bank, or accompanied by written letters 2. RATIFICATION. of guaranty so signed when transferred to the National Bank, and the latter parted with money equaling their face value on the faith of this endorsement or guaranty.    The Savings Bank retained the money so received and thereby acquiesced in what was done in procuring it, effectually ratifying the acts of its cashier.    *Hawkins v. Fourth National Bank,* 150 Ind., 117 (49 N. E. Rep. 957); *People's Bank v. Mfg. National Bank,* 11 Otto, 181 (25 L. Ed. 907).

The appellant concedes this, but questions the validity of the renewals.    It will be recalled that new notes were executed by the cashier and substituted for those first nego-3. UNAUTHOR- tiated by him to the National Bank.    Appellee IZED act of cashier; liabil- insists that as the time within which payment ity of bank. might be exacted from the Savings Bank was extended, this furnished good consideration, and the latter is as completely estopped as by the retention of the money received on the original transfer.    That the extension of the time within which payment of the note must be made is a valid consideration must be conceded.    But did these transactions amount to a mere extension of time, and, if so, were they binding on the parties thereto?    The National Bank was undoubtedly charged with notice that Geneser, as cashier, had no authority to deal with himself individually, or as treasurer of the oatmeal company in accepting new notes from himself, or as agent in the place of others, or extend the time of those outstanding.    It must be charged with

knowledge of the law.   It is elementary that an agent cannot bind his principal even in matters touching his agency where he is known to be acting for himself or to have an adverse interest.   *Manhattan Life Ins. Co. v. Ky.,* 34 N. E. Rep. 776; *Edwards v. Carson Water Co.,* 34 Pac. Rep. 386; *First National Bank v. Gifford,* 47 Iowa, 582.   Says Mr. Thompson in Volume 7 in his commentaries on the Law of Corporations, Section 8412, "It is scarcely necessary to say that where the officers of a corporation act in a given transaction for themselves as individuals, and this is known to the other contracting party, the corporation will not be bound by the contract, although in form it purports to bind it."   The transactions with the National Bank were of such a nature as themselves to impart notice to it of their illegibility.   The renewals were executed by him in presence of the National Bank's president, who must have known that as cashier of the bank Geneser was undertaking to contract with himself as treasurer of the oatmeal company, acting for both corporations, when adversely interested, and that the renewal notes were accepted from himself individually, contrary to the express prohibition of the statute heretofore quoted.   With knowledge of these facts, the defendant was put on inquiry as to Geneser's authority in accepting them for the bank in place and stead of those which had matured, and in endorsing them over. He was helpless in the matter of extending the time of payment, for the law will not permit an agent when undertaking to deal with himself individually or in behalf of another adversely, to bind his principal, unless previously authorized or his acts are subsequently sanctioned.   Nothing could be added in such cases by an endorsement or guaranty by the cashier.   Otherwise, though without power to bind his bank by accepting his own note, he might obligate it by transferring them to another.   He was precluded from acting for himself and his principal as to anything with respect to which their interests varied.   *Bank v. Gifford,* 47 Iowa, 575; *Victor Gold & Silver Mining Co. v. National Bank,* 40 Pac. Rep. (Utah) 826.   If there was a general guaranty executed

by him, as claimed, the National Bank took it with knowl-
edge of the limitations of the cashier's agency. He could
not thus forestall objection to his power as cashier. It could
furnish the National Bank no protection as to notes of his
own, or as treasurer, which, as cashier of plaintiff, he could
neither accept nor transfer.

III.   Conceding all this, however, it does not follow that
the plaintiff is entitled to recover the amount paid for those
notes on the 20th of January, 1897. The president of the
National Bank at that time demanded that
they be taken up because of the alleged obliga-
tions of the Savings Bank to do so. In response the check
for the necessary amount was delivered to him and these
notes turned over to Blackburn, the recently elected cashier
of the Savings Bank. This was nearly three months prior to
their maturity, and resulted in the appointment of a receiver.
The directors learned of the transaction a few days later, but
made no objection or inquiry. The most superficial investi-
gation by them or Blackburn would have disclosed that the
Savings Bank received neither money nor credit for these
notes at their date nor during the several months previous,
and the conclusion would have been inevitable that they were·
either renewals or had been transferred without considera-
tion. The circumstance that they were paid before maturity
was enough to arouse inquiry, and if followed up would
doubtless have led to the discovery of the general written
guaranty, if any there was. Moreover, the books and officers
of both banks were accessible, and, so far as appears, no ob-
stacle was interposed to any investigation the officers of the
Savings Bank might have desired to make. That they should·
have remained in utter ignorance of the character and genesis
of these notes for four years is inexplainable unless attrib-
uted to the perverse inattention to their own interests. By
the exercise of ordinary diligence they ought to have ascer-
tained the facts within a few days, or at the utmost within
a few weeks after the transaction. In the meantime the.
bank treated the notes as its own. The receiver collected

4. FRAUD: dis-
covery: re-
lief.

$2,422.82 on the oatmeal company note. After the organization of the bank in June, 1897, the remainder was included with other indebtedness in a note of $20,292.44 executed to the bank by J. W. and Francis Geneser and J. B. Schuster May 2, 1898. Upon the payment of $7,000, Schuster was released. The note was secured on the property of Francis Geneser. The decree foreclosing this, which had been entered at the time of hearing, has since been affirmed. *German Savings Bank v. Geneser,* 116 Iowa, 119. The individual notes of J. W. Geneser were computed with his other indebtedness at $12,209.26 May 31, 1897, and surrendered to him upon the execution of six new notes. The first, of $2,000, was made payable in one year, and each of four others, for like sums, on the 31st of May of each of the four succeeding years, and the last, for $2,209.26, in 1903. These were signed, also, by Francis Geneser. Three of them had been put in judgment at the time of trial. This action was begun February 21, 1901—four years and one month after the transaction. As said, the gist of complaint is that the national bank by demanding payment through its president, represented to the savings bank that the notes were discounted and indorsed in the usual course of business, and that the savings bank was liable thereon, and that this representation, being untrue, was such a fraud as to entitle the savings bank to recover the amount paid. It is exceedingly doubtful, in view of the character of the notes and their immaturity, whether such a demand might be so construed. Possibly collusion may be imputed to Geneser, but this is not charged against Blackburn, the newly elected cashier. But conceding he might have been deceived, the transaction has been acquiesced in so long as to preclude the application of the remedy sought. It may be that the officers of the bank remained ignorant of the genesis of these notes, but this was their fault. The means of knowledge were at hand, and, by ordinary diligence, any fraud connected with the transaction would have been discovered within a year, at the most. A party defrauded must be diligent. The means of knowledge

are equivalent to knowledge. A clew which, if followed up diligently, would lead to a discovery, in law, is equivalent to a discovery—equivalent to knowledge. *Norris v. Haggin* (C. C.) 28 Fed. Rep. 275; *Wood v. Carpenter,* 101 U. S. 139 (25 L. Ed. 807); *New Albany v. Burke,* 11 Wall. 107 (20 L. Ed. 155). "A party seeking relief on the ground of fraud must aver and show that he used diligence to detect it, and, if he had the means of discovery in his power, he will be held to have known it." *Buckner v. Calcote,* 28 Miss. 432. The principle is so elementary that possibly the citation of authorities is unnecessary. The rule that a party must rescind within a reasonable time after the discovery of the fraud is equally well established. *Stetson v. Northern Investment Company,* 104 Iowa, 393; *Moore v. Howe,* 115 Iowa, 62; *United States Stock Co. v. Ry.,* 34 Ohio St. 450 (32 Am. Rep. 380); *Veasey v. Graham,* 17 Ga. 99 (63 Am. Dec. 228). We conclude that as the remedy was not sought within a reasonable time after the fraud alleged ought to have been ascertained, and as the plaintiff has continuously treated the notes as its own, it ought not to be permitted at this late day to rescind and recover the amount paid. The evidence of damages was not such as to sustain a recovery on any other theory.—AFFIRMED.