MARY J. O'MEARA, MARY O'MEARA, KATE O'MEARA, JAMES O'MEARA and VERONEA O'MEARA, Appellants, v. GEORGE. C. LAWRENCE and G. F. FARAGHER.

Agency: FRAUD OF AGENT: EVIDENCE. One employed as an agent to sell property at a stated net price to the owner, with a commission out of the amount received in excess of such price, has no authority to buy it himself or to sell it to another with whom he is interested in the transaction, without the knowledge and consent of the owner; and any contract so made in which he is interested is void. The evidence in this case is held to show that defendant was interested in the contract, as a purchaser, with another and was seeking to acquire a part of the profits, and that the contract of sale was void.

*Appeal from Jones District Court.*—HON. F. O. ELLISON, Judge.

TUESDAY, MAY 6, 1913.

PETITION to cancel contract of sale was dismissed, and decree of specific performance thereof entered as prayed. The plaintiffs appeal.—*Reversed.*

*Remley & Remley,* for appellants.

*Jamison, Smyth & Hann,* for appellee, Faragher.

*Geo. C. Lawrence* and *Herrick, Cash & Rhinehart,* for appellee, Lawrence.

LADD, J.—The plaintiffs, who reside in Oklahoma City, Okla., own one hundred and twenty acres of land in Jones county subject to a railroad right of way. Mrs. O'Meara has been looking after this land in her own interest and that of

her children, the other plaintiffs, and in 1911 proposed to defendant Lawrence, who had attended to the renting of the land for her, that he find a purchaser. On May 12, 1911, she wrote that: "If you make a sale I want $8,400 clear of everything. You work to get your commission over that amount and let me hear from you." On June 24th following, she wrote: "If you can get the commission out of them get it and I will give them half of the rent money. The rest will do to pay the debt that has been made for repairs on the place." On July 31, 1911, Lawrence, as agent for Mrs. O'Meara, entered into a written contract with defendant Faragher by the terms of which she was to convey the land, describing it, except the right of way, "the part hereby conveyed containing 117 acres," for the consideration of $70 per acre, $100 in cash, the receipt thereof being acknowledged, and the remainder March 1, 1912. Other conditions need not be stated. Lawrence signed Mrs. O'Meara's name by himself as agent, and it was signed by Faragher. This contract was acknowledged by the signers and recorded August 12, 1911, after Mrs. O'Meara had repudiated it, and in this suit plaintiffs ask that the same be canceled as void and be expunged from the record, for that the sale was not at the price authorized and was actually by Lawrence to himself; the contract being made in Faragher's name to conceal that fact.

The answer put in issue the allegations of the petition, and by way of cross-petition Faragher prayed that the contract be reformed by making the sale subject to the railroad right of way, instead of excepting it, and for specific performance. There was error in granting this relief. The evidence leaves no doubt but that Lawrence was the agent of Mrs. O'Meara to sell the land at $8,400, and that he was to get a commission as payment for his service out of the price obtained above that amount. But this did not authorize him to sell the land to himself at that price or any other, or to himself and another. An agent is not permitted to serve another than his principal in transacting the latter's busi-

ness without the principal's consent thereto. This is for the reason that the law will not permit the agent to place himself in a situation in which he may be tempted by his own private interest to disregard that of his principal. Human experience has demonstrated this is the only safe rule, founded, as it is, in that profound knowledge of the human heart which dictated that hallowed petition, "Lead me not into temptation but deliver me from evil," and that occasioned the announcement of the infallible truth that " a man cannot serve two masters." *Casady v. Carraher,* 119 Iowa, 500. A man cannot, in one and the same transaction, act for himself and as agent for another, without the latter's consent, for the interests of the two conflict. *First National Bank v. Gunhus,* 133 Iowa, 409.

It is enough in such a situation if the agent is interested adversely to his principal to invalidate that which is done. *German Savings Bank v. Des Moines National Bank,* 122 Iowa, 737.

Viewing the evidence in the light of these principles, little difficulty is experienced in reaching the conclusion that the alleged sale was a mere subterfuge on the part of Lawrence to acquire not merely a commission for services rendered, but a portion of the purchase price in addition thereto. On the very day the above agreement was signed, Lawrence entered into a contract with John M. Dailey to sell one hundred and twelve acres of the land—omitting five or six acres across the railroad—at $85 per acre, $300 in cash, $1,000 March 1, 1912, and the remainder in five years. Both contracts were executed in the same afternoon.

Neither Faragher nor Lawrence were able to remember which was signed first, but both did remember that $100 of the payment by Dailey was to be used as a payment to Mrs. O'Meara. Faragher had talked with Dailey through the telephone in the afternoon before, and the latter came to town that morning, and Faragher showed him the land. Before going out to see it, however, Faragher had called at the

office of Lawrence and talked the matter over. Faragher testified that:

We knew Dailey did not have much to pay down and supposed, as we had in other deals I had, Lawrence was to take the deed and take a contract, what we call the Schoonover contract. I told Lawrence that I thought I could sell the farm for probably $80 or $85 and it was good money. He could borrow the money and have one-half the profits. Q. Then you and Lawrence were buying it together, and you and Lawrence were selling it to Dailey? A. Lawrence made the sale contract. Q. You were to have an interest? A. I was to have an interest in the profits, yes. Q. You and Lawrence were to share the profits equally? A. Yes. Nothing was said about his commission; only he was to have one-half the profits. . . . Lawrence was to have one-half the profits between $8,400 and $85 per acre. He was to have one-half the profits in the sale to Dailey. (On the cross-examination the witness was asked): Q. You submitted to Lawrence the proposition of Dailey to pay $1,300 and borrow the balance. A. Yes. Q. To help you out? A. Yes. Q. What was the deal made with Dailey, $85 per acre? A. Yes, in consideration of Lawrence furnishing the money and helping me through with the deal, I offered to give him one-half the profits on the price he had made to me, $8,400, and the sale to Dailey at $85 per acre. (On redirect examination, the witness continued). Dailey gave me a check for $300 when he bought the farm, and I told Lawrence to use $100 of that to pay on the contract. Q. You did not pay Lawrence the $300 on the contract? A. He only took $100 of the $300. . . . Q. The verbal arrangement between you and Lawrence had been made how long prior to going down to show the land to Dailey? A. That morning. Q. You talked it over with Lawrence that morning? A. Yes, after I talked with Dailey over the phone. Q. That is, made an arrangement with Lawrence? A. Yes; that is, made an arrangement about furnishing the money. Notified him of the amount of money Dailey could raise. . . . I made the arrangement with Lawrence about the sale of this farm and me get one-half the profits for selling it that morning. Q. At the time you signed this contract with Lawrence, Dailey and Lawrence had already signed the contract? A. I

couldn't say which was signed first. Q. It was understood you were to make it? A. Both made the same time. Q. The whole thing understood between you and Lawrence that whole day? A. Yes. Q. He was to sell it to you, and you was to turn around and sell it to Dailey and both share the profits equally? A. Yes, Lawrence and I had that arranged at the time, and Lawrence was to take the deed. Q. Take the deed to secure him for the advancement of money and both share equally in the profits? A. Yes. . . . I told him I would take the farm at $8,400. I left it to him to make the contract and I went away. . . . I had arrangements already made with Lawrence about the money. . . . I told Dailey that Lawrence had money in the farm and told him I thought he would make the contract with him. I ain't sure I told him I was showing him the farm for Lawrence. . . . When I took Dailey down to look at the farm, I knew he could pay only $1,000. Lawrence agreed to furnish the money. I won't say for sure that I knew it at that time or after dinner.

Faragher further testified that he had left the contract with Lawrence and had not seen it since.

The evidence was undisputed that a reasonable commission for selling the farm was $1 per acre. The testimony of Lawrence was substantially the same as that of Faragher. He testified that the latter came to the office in the morning of July 31, 1911, and said that he thought he had a purchaser for the farm, and that he thereupon showed him letters from Mrs. O'Meara, and Faragher then agreed to buy the land on the terms stated in the contract, and that the party he had taken out could pay only $1,000 on the farm, and the balance would have to be provided for in some way; that he agreed to furnish the necessary funds and divide the profits; that, in drawing the contract so as to except the right of way, he had in mind the drawing of the deed so as to avoid liability for breach of warranty; that, when he made the contracts with Faragher and Dailey, he had no other purpose than to bring about the sale of the land; that, when Faragher came to his office in the morning, "no mention was made of $85 per acre.

He made mention of the money that perhaps he would have
to have help in the sale of the farm. I told him that perhaps
we could make some satisfactory arrangement about it." He
was asked, if Faragher took "anybody down and sold to
him, then you would furnish the money. Was not that the
arrangement? A. Possibly, I do not remember. Q. When was
it mentioned to you, do you know that? A. Either then or
after he came back. Q. You heard Faragher's testimony about
that. A. Yes. Q. You think that isn't true? A. No, I do not
know whether before he took Dailey down. We made arrange-
ments before the contract was actually drawn up and signed
with Dailey. We were to share the profit equally. Q. You
sold to Faragher that day and you sold to Dailey that day?
A. No, Mr. Faragher sold to Dailey. Q. Didn't you make the
contract A. I drew the contract. Q. Didn't you sign it? A.
Yes. Q. Did Faragher sign it A. No." Witness further ex-
plained that the reason he signed it instead of Faragher was
that they didn't anticipate any lawsuit. "Mr. Faragher and
I had no mistrust but what everything would turn out all
right. We did not get down to pins and needles. I had con-
fidence in him and he in me. We worked right along together
and were to share equally in the profits. Faragher suggested
that the contract be made in my name because he thought it
might be more satisfactory to Dailey."

We have set out the evidence of defendants somewhat in
detail, for, considered as a whole, it conclusively shows that
Lawrence was interested as a purchaser of the land and that
Faragher was merely acting his part to acquire half of the
profits. Moreover, the additional facts demonstrate with pe-
culiar force the wisdom of the principles heretofore stated.
Three or four days after the above transaction, August 3, 1911,
Lawrence wrote to Mrs. O'Meara that a party of whom he had
written before was anxious to exchange as a part payment
on her land 160 acres in Kansas, describing it, and saying:
"The party will pay you $70 an acre for your farm and if
you will allow him for what the interest will amount to from

now to March 1st, next at the rate of six per cent. per annum, he will settle for the farm right away, and is willing that I go down to your city, and take the money with me and settle with you there. You to convey the land to him by warranty deed, and furnish him an abstract of title, and pay the taxes for this year. Out of the rent money for the present year, I will pay your bills here for the grass seed, and the stock watering tank, etc., and the balance will be the commission for making the deal just as you stated in your letter of June 24th, last. . . . I think the railroad takes three acres of your farm, which you could not get pay for.'' On the day this reached Mrs. O'Meara, Lawrence arrived in Oklahoma City, Okl., and said to her that he had come down to close the deal on the Kansas land and offered her a draft of $6,500 as the difference. She refused and testified that two days later he offered her this draft and $1,500 or $8,000 for her land he claims to have previously sold for $8,400 and, when she said she had concluded not to sell, threw the Faragher contract on the table and said the land was sold. He denied having made the last offer. The testimony that Faragher knew in advance nothing of this trip and what he was to do is undisputed. The Kansas land belonged to a brother-in-law of Faragher, and the latter was agent for its sale. The expenses which he proposed to pay in his letter were $56 and the rentals, $400, and though with Faragher undertaking to appropriate $15 per acre or nearly $1,800 as a commission, avarice was not satiated. With this much in sight, he sought an additional commission of $344 from the rent and to buy the land at less than that of the pretended sale to Faragher by what the right of way would come to at $70 per acre, and by exchanging the Kansas land priced at $1,600 with $6,500 therefor and finally buying it for $8,000 in cash.

Was he to share these unlawful profits with Faragher? If so, he had not so informed that individual. As said, the evidence conclusively shows that the pretended sale was in fact to Lawrence in the name of Faragher or to Lawrence and

Faragher. The letter with the transactions at Oklahoma City put beyond doubt, what appeared from the testimony of defendants, that the making of the contract with Faragher was part of a scheme through which Lawrence was to acquire title to the property and sell it to Dailey, and thereby obtain not merely a commission but a portion of the purchase price of the land. Faragher did not pay a cent on the contract, and neither he nor Lawrence so designed. Lawrence retained all papers, and, notwithstanding the contract with Faragher, was to have title, and this was all arranged in anticipation of a sale to Dailey. Had not the sale to Dailey been effected, no argument is required to demonstrate that no contract would have been prepared for or signed by Faragher. The latter understood he was no more than sharing the profits, and so did Lawrence, for otherwise the latter would not have been trying to exchange Kansas land for it or trying to buy it at $400 less than the selling price and retain the rent after its actual sale to another. All this was so well understood that there was no arrangement between Faragher and Lawrence for a transfer of title from the former to the latter in order to enable him to convey to Dailey. As said, the record is conclusive that the papers were drawn as they were as a mere subterfuge to conceal the interest of defendant Lawrence in the transaction as purchaser. He could not purchase from himself as agent.

The cause is remanded for decree canceling the contract and expunging the record.—*Reversed.*