MATHIAS RODENKIRCH et al., Appellants, v. J. D. LAYTON et al., Appellees.

**APPEAL AND ERROR:** Certified Report of Trial—Stenographic
1 Notes in Lieu of Evidence. Basis for appellate review *de novo* is properly laid by filing a certified stenographic report of the trial within six months after entry of decree, and by filing the certified transcript of said notes *after* said six months.

**FRAUD:** Gross Deception and Inadequacy of Price. Equity may
2 grant relief, even though a scheme be so. cunningly planned and ingeniously executed as to enmesh the victim in a net of intrigue, without disclosing any actionable misrepresentation. Evidence reviewed, and held to show such deception and gross inadequacy of price as to demand the cancellation of a deed.

**PRINCIPAL AND AGENT:** Agent Serving Two Masters—Avoid-
3 ance of Contract. When a contract is the result of services rendered by an agent serving both parties to the contract, it is voidable at the instance of the party who did not know that the agent was acting in a dual capacity.

*Appeal from Winneshiek District Court.*—C. N. HOUCK, Judge.

MARCH 23, 1920.

REHEARING DENIED JULY 6, 1920.

SUIT to cancel deed purporting to convey certain lots of plaintiffs' to J. D. Layton, and to quiet title therein. Layton alleged title in the property, and prayed that it be quieted. On hearing, the petition was dismissed, and the relief prayed by Layton granted. The plaintiffs appeal.— *Reversed.*

*William S. Hart,* for appellants.

*E. R. Acres, Carter & Sullivan,* and *Burling & Burling,* for appellees.

LADD, J.—I. No certified transcript of the evidence was filed within the time allowed for appeal. But a duly certified shorthand report of the evidence was. Under the original Section 3652 of the Code of 1897, appellant was, therefore, not entitled to review *de novo.* But he contends that, under an amendment to that statute, said filing of shorthand report gives the right to such review. Appellees insist that the amendment has not changed the law, and that the timely filing of certified transcript is still essential. The amendment to the statute is:

1. APPEAL AND ERROR: certified report of trial: stenographic notes in lieu of evidence.

"But this section shall be so construed as to include the evidence taken in shorthand, when the reporter's notes of such evidence have been certified to by the judge and reporter within the time herein provided."

Appellees argue that public records must be in the English language, and in such form as that the layman who is able to read English can read such record, and that it is a mere form to have a trial judge certify a shorthand report which he is unable to read. But does that prove the deduction that the legislature lacks the power to add to that requirement of the original statute which demands

that the evidence must be taken down in writing a modification that a duly certified shorthand report shall be considered writing? Grant that it was impolitic or unwise to treat a shorthand report as written evidence, yet that does not affect the power to make such provision. The legislature had power to permit appellate review, though the evidence were not taken down in writing at all. On the law side, it has been held that the appellant may prepare his abstract from his own private memorandum. The legislature had power to permit such to be the basis of review *de novo*. It had power to make the basis for such review whatever it pleased, provided this fell short of denying a trial *de novo*. It was under no compulsion to enact that the evidence should be certified, and had power to say within what time it should be certified, and when, if at all, it need be filed. It follows that it had power, after providing as a basis for review that the evidence must be taken down in writing, to define what should constitute writing. If it could dispense with all certifying, it could make a merely formal certificate a sufficient basis for review. The only question is whether it *has* made a qualification that makes the certified stenographic report the equivalent of a taking down in writing. If it did not intend to do that, the amendment was utterly idle; and we must not presume it was framed to accomplish nothing. We think it was intended to enact that the filing of such report might be the basis for appellate review. And, granting that certifying of the shorthand notes by the judge is a mere ceremony, there does come a time when he certifies the transcribed evidence, and at that time, his certification will not be a mere ceremony. The only real difference effected by the statute change is that the old-fashioned written evidence, the certified transcript, may be filed later than within the period allowed for appeal. So that the mischief that might be done, if there were no basis but the stenographic report, is but an imaginary mischief. What it all comes to is that it is a sufficient basis for appellate

review to file the shorthand report, duly certified, and within the six months, and that, the basis being laid, a longhand transcript is later to be furnished, if required to settle conflict in the abstracts.

While the question now before us was not, in strictness, decided by *Richardson v. Fitzgerald,* 132 Iowa 253, that which was said on the point now here in consideration lay in the pathway of the decision, and gives some support to our holding.

The cause was heard on depositions, and the recital in shorthand was merely of the offering of these in evidence, the objections thereto, and the reading of the same. The transcript, therefore, could be of little service in the preparation of the abstracts, but was duly certified and filed, when its omission was called to the attention of counsel for appellant. This was in time, though more than six months subsequent to filing of the decree.

II. One of the plaintiffs, Mathias Rodenkirch, acquired certain lots with a double, two-story building and dwelling house thereon, in Castalia. Their value was estimated to be $12,800. He desired to exchange this property for a small farm, near a church and school of his own faith, and employed A. J. Schuler as agent, with the understanding that the latter should have a commission of 5 per cent, if a deal were effected. Schuler returned, shortly after this talk, and told Rodenkirch that he had met a man on the train, whom he did not know, who had 240 acres of land near Arlington, for which he could trade his property, and that he (Schuler) could exchange the 240 acres for 80 acres in Minnesota, at $75 to $78 per acre. No mention was made of the then owner D. D. Layton; for one of the Laytons had shown Rodenkirch an 80-acre tract south of Lime Springs, several months before, at $175 per acre, worth less than half that amount, and he had informed Schuler that he would have nothing further to do with them. It was arranged that they meet at Postville, the Monday morning following, which they did, and, accompanied by Long, the

2. FRAUD: gross deception and inadequacy of price.

three proceeded to the farm. Layton reached the farm earlier, and had offered Culver, who was in possession as receiver under foreclosure proceedings, "$50 to help put the farm onto the man they were going to bring out," and told Fox, son-in-law of White, who was foreclosing, that, "if he said a good word for the place, he would slip him $50." Fox, with his wife and Mrs. White, was then in charge of the buildings during the haying season. On the arrival of the parties previously mentioned, Layton, who was about 29 years of age, posed as a Scandinavian, and was introduced to Rodenkirch by Schuler as "Gullickson." The latter told Rodenkirch, in broken English, that the farm was worth $150 per acre and could be sold for that, and Schuler intervened with the statement that he had an uncle, living a mile and a half distant on the other road, of whom he could inquire. "Gullickson" explained that the people there were in bad shape; that they formerly owned the farm; went to Dakota, where the young man wrecked his father financially; and that the latter was then in the hospital for the insane in that state; that they wanted to buy the farm back, but were not financially able, and he allowed them to live there (all of which was false, save that White had owned the land); that, when he bought the farm, he thought he would be exempted from the war, as he had a wife and child, but found out that he would not be exempted, and was selling on that account. On their return to Arlington, Schuler called Rodenkirch to one side, and advised him to inquire of the banker the price of land; and, on asking a person in the bank, he was informed that it was $150 per acre "around here." While at the farm, Schuler inquired of Culver "what farms were selling for about the country," to which Culver responded, "$85 or $90 per acre." Schuler also cautioned Culver not to let Rodenkirch know Layton's name, and gave another by which to designate him. The parties then proceeded to Castalia, to examine the lots with buildings thereon, and, these being satisfactory to "Gullickson," Schuler and Rodenkirch went

to consult the latter's wife, who appears to have considered the farm, as well as the incumbrance against it, too large. Schuler assured her that the farm could be sold right away, and, after Long came up and warned her that, if they didn't get rid of their property, there would be likely to be trouble, as cards were being played in the back room, she finally told her husband to do as he thought best. The several parties then proceeded to Postville, and procured an attorney to prepare the contract of exchange. Erwin testified that Layton and Schuler cautioned the attorney that Layton's name was not to be mentioned until after the deal was closed, and Rodenkirch swore that the attorney, in reading the contract, explained that he was the first party and "Gullickson" the second party, and did not read the names inserted in the contract, and that he was not aware that "Gullickson" was really D. D. Layton. He asked for "Gullickson's" address, however, before they parted, whereupon the latter wrote his true name and address on a slip of paper, handed it to Rodenkirch, and the latter put it into his pocket without reading it. While he was walking down the street with "Gullickson," a person said, "How do you do, Mr. Layton?" whereupon, in response to inquiries, "Gullickson" assured Rodenkirch that he was not related to Layton. Rodenkirch examined the slip of paper the next day, and discovered thereon, "D. D. Layton, Aurora, Illinois," and expressed dissatisfaction with the deal to Long, and, on the morning following, took the train for Postville. Long was on the same train. Rodenkirch met Schuler, on leaving the train at Postville, and told him that he would call the deal off, explaining that D. D. Layton had been passed off as "Gullickson." At first, Schuler assured him that he did not know Layton, but finally admitted having known him, and explained that he knew plaintiff would not look at the land, if he knew the owner was Layton. Long came up, about this time, and to him Schuler remarked, with an oath, that someone had "put him (Rodenkirch) up against." J. D. Layton, father and partner of D. D.

Layton, had dropped off the train that morning, and, coming up, said he would go over to the post office for his mail, and, upon returning, remarked that "he had two buyers for that farm already," and that he had just opened two letters, the envelope to one of them lying in the street, and, after reading both, he placed them in one envelope, and gave them to plaintiff to show to his wife. One of these letters purported to have been written by H. Goodhile, Manchester, Iowa, and read:

"Emil Zenft & Son of Oelwein, Iowa, was down to see Mr. Rhines on this last Saturday, and said they had a man that wanted to trade in a $\frac{1}{4}$ section of land in Canada on the farm that you got of Mr. Rhines and wanted $35 per acre for his Canada land and give you $150 per acre for the Rhines farm so better see them if you have not already made the deal on the farm let me know what day you will be down to fix up contract with E. S. Cowles as you wrote yesterday about this deal."

The other letter purported to be signed by Rhines, and read:

"There was a man in my store and he said that he came to buy the place that I sold you and that he would buy the place. I told him I had sold it and that he must buy it from you. If you would take in a quarter that he had in Canada that he wanted 35 an acre for it and he said that he would give you one hundred and fifty at once so you had better come at once."

After some parley, it was arranged that Rodenkirch should have the benefit of the proposed exchange for Canada land, and he and Layton proceeded to Oelwein, where they met Zenft. The latter had no authority to act for Smith, the party handling Canada land, who was absent. Layton prepared a contract, however, which Rodenkirch signed, and it was left for Smith to execute. They returned by way of Ossian, where Rodenkirch had an attorney prepare a conveyance of the Castalia property to Layton, and took it with him to that place, where he and his wife signed and

acknowledged it before the cashier of the local bank, as notary public; and the deed, with the abstract to the property, was turned over to Layton, who treated it as delivered, and swore, in substance, that it was delivered to him unconditionally. Rodenkirch testified that it was handed to Layton to be deposited with the deed from Rhines, with blank for grantee's name, in the bank at Postville, and that the deal was to be there closed, August 7, 1917, as provided in the contract. That instrument did so provide, and also that each party should furnish abstract of title to their respective properties to date, showing merchantable title. The abstract of title to the farm had not been brought to date, and, when subsequently mailed to Rodenkirch, disclosed the condition of the record to September 18, 1915, only. Immediately after signing the deed, he paid Schuler $600 as commission, which the latter divided with Long. Layton, on the day after receiving the deed, mortgaged the Castalia property to secure $5,330 owed to McEwen, who forwarded the deed for record, and then sought to obtain from the cashier of the Castalia bank the insurance policies covering the buildings on the lots in controversy. On being informed of this, Rodenkirch consulted his attorney, and this suit was begun.

Such is the outline of the story of the several transactions through which Rodenkirch was induced to agree to the exchange of his property fairly worth from $6,000 to $12,000, for a farm incumbered for more than its actual value. There is always something about such a transaction which, though difficult to express, speaks louder than words. The very atmosphere seems charged with the spirit of deceit. It works out too perfectly not to have been carefully planned in advance. Through it all is evidenced the carefully laid scheme to entrap the unwary, suggesting the web woven by the spider for the fly. Ordinarily, the victim is one who, like Rodenkirch, has dealt somewhat in realty, but has never come in touch or been associated with experts in the art of deception. He treats the person em-

ployed as agent, even though he be secretly in the employment of the party with whom he is dealing, or though, to effect conditions on which his commission depends, he is ready to sacrifice the interests of his principal. The victim pays no heed to the presence of a third person, apparently disinterested, along for the sole purpose of putting the deal through, nor is he likely to appreciate the psychological influence of a carefully planned reception on the premises being shown, or of the delicate flattery of being assured that he knows more about land than anyone can tell him. In the case at bar, the plan had been worked out with marked ingenuity, and carried out with a degree of skill which, if exerted in a worthy cause, must have excited sincere admiration. Layton, with whom Schuler had been associated in handling land ventures several months, put the land near Arlington in his (Schuler's) hands for sale, and assured him that, if he procured a deal, he would make it right. Schuler found Rodenkirch, and arranged that he would find a deal for him, and that, if he succeeded, he should have a commission of 5 per cent. This latter is undisputed, and that he was acting for Layton appears from his own testimony, when called by defendants as a witness:

"Q. Were you acting as agent for D. D. Layton or J. D. Layton in that matter in any way?     A. I wouldn't know how to answer that. Mr. Layton told me he had that property down there, and told me to find him a deal on it, and I done so. Q. Were you to get any compensation from D. D. Layton? A. If I was, I never did get any."

On cross-examination, he swore that:

"Layton and I have been working together, handling land ventures, for about five months. Layton said that, if I got any land deals for him, he would make it right. Rodenkirch's trade was the first deal I closed for Layton. * * * Layton put this Fayette County farm in my hands for sale, a week or two before I took Rodenkirch down. * * * First solicited Rodenkirch for another tract of Layton's land."

On redirect examination, he explained that he "didn't consider himself agent for either of the Laytons in this deal." He testified later that he "was not acting as agent for D. D. Layton or J. D. Layton in any way. I had no deal made with Mr. Layton at all, and I claimed no interest in the property whatever." This is merely the witness's conclusion, but, as observed, is entirely inconsistent with his testimony as previously detailed, which his conduct tended strongly to confirm. In the first place, he took Long with him, and, according to his testimony, had employed him to sell hail insurance, agreeing that, if they made "any land deals, he would divide fifty-fifty with him; and that is how he came to be in this deal. Rodenkirch didn't know that Long was in on this deal. Nothing was said to Rodenkirch or in his presence as to what Long was doing, along on the trip to Arlington. So far as anything was said, Long was a perfect stranger to the transaction." And Long played his part of indifference. Schuler knew that Layton was playing the innocent part as a Swede, speaking broken English, and promoted, if he did not originate, the scheme, by introducing him to Rodenkirch as "Gullickson," and cautioning Culver not to mention Layton's name in Rodenkirch's presence. Later, when informed by Culver that the land did not exceed in value $85 or $90 per acre, Schuler not only withheld this information from Rodenkirch, but acquiesced in Layton's misrepresentation to him that it was worth $150 per acre. There is no escape from the conclusion that Schuler was employed by Layton to find a deal for this farm, and actively assisted in consummating it, and that, while so employed, he engaged to act for Rodenkirch in finding a deal for his lots for a farm, without disclosing to the latter his relations with Layton. As Layton knew that Schuler was pretending to serve Rodenkirch, and was aware, from the circumstances recited, that Rodenkirch did not know he was in Layton's service, any contract procured by the latter under these conditions was tainted with fraud.

An agent cannot serve two principals without the in-

telligent consent of both. The law will not permit an agent to place himself in a situation in which he may be tempted by his private interest to disregard that of his principal. "A man cannot serve two masters" is an infallible truth, and, where a contract is the result of services rendered by an agent serving both parties thereto, one of whom is aware of such double agency and the other is without knowledge that the agent is serving the other party, the contract is voidable, because the one party with full knowledge joined in the deception. *O'Meara v. Lawrence,* 159 Iowa 448; *Lister v. La Plant,* 183 Iowa 1363. See, also, *Montgomery County v. American Emigrant Co.,* 47 Iowa 91; *Wilson v. Webster,* 88 Iowa 514; *Casady v. Carraher,* 119 Iowa 500; *Mayer v. Hamre,* 162 Iowa 662; *Stapp v. Godfrey,* 158 Iowa 376; *Rasmussen v. Hansen,* 176 Iowa 26.

3. PRINCIPAL AND AGENT: agent serving two masters: avoidance of contract.

Deception also was practiced as to the value of the land. The record disclosed that W. J. White purchased it in 1900 for $33 per acre, and that he sold it to Rhines in 1915 for $24,700, all but $18,000 being paid, and that secured by a mortgage on the premises. The grantee proceeded, on August 26th of the same year, to load it with a second mortgage, securing an indebtedness of $3,071.87 to the Lamont Savings Bank. No attention seems to have been given to the land by Rhines until he exchanged it to D. D. Layton for a section of land in Deaf Smith County, Texas. In the meantime, White foreclosed the first mortgage, buying the land in at the sheriff's sale, June 9, 1917, for $20,664.35. The incumbrances then on the land, August 1, 1917, amounted to $24,470.60, plus about $200 in taxes, levied in 1916. White testified that, in his opinion, the farm was hardly worth what he had against it, or $20,644.35, with interest from June 9, 1917. Culver, who was appointed receiver in the foreclosure proceedings, thought $85 or $90 per acre would be a good price for the farm. Sibel, whose land joined it, estimated its value at $80 to $90 per acre, and Zenft thought it could be sold for $100 to $110 per acre. This evidence was not controverted, and there is no

room for saying that its value was more than the incumbrances against it. Rodenkirch was getting nothing out of his property at Castalia, and must have relied on Layton's misrepresentation of value. He testified that he had confidence in Gullickson, and believed him when he told him that the land was worth $150 an acre and over, and also believed him when he told him he bought the land so that he could escape military service, and was selling only because he found out it wouldn't keep him out of the army; that he believed him to be what he represented. Having walked over the land, he was not in a situation to claim any deception as to quality of the soil; but he had never been in the vicinity of this land before, and had no information concerning its market value save through "Gullickson" and the person at the bank to which Schuler led him to inquire. The transaction reminds one of *Lister v. La Plant*, 183 Iowa 1363. There, the party was little past majority; here he was an Americanized Luxembourger, who knew so much that Layton touched his vanity by wondering at his recognition of the different kind of weed seeds, and told Schuler in his presence that there was no use telling him anything about the farm, for he knew more than they. There, the plaintiff had parted with property worth $14,800; here, with property worth about $10,000. There, it is said that inadequacy of price is evidence, slight or powerful, according to its relative amount and other circumstances, and that, as "opinions of value differ greatly, we are not inclined to give the disparity between the value of plaintiff's property and what he received, greater significance than that of a strong and persuasive circumstance tending to show that he was in some manner influenced and deceived." In that case, there was controversy as to the value of defendant's farm; here, there was none; and, according to the undisputed evidence, the plaintiff's property was being obtained without valuable consideration.

Another matter should not pass without attention, and that is the remarkable combination of circumstances.

After entering into the contract at Postville, D. D. Layton dropped out of sight. Long appeared in Castalia, the following day, and learned of Rodenkirch's dissatisfaction, and, of course, took the train for Postville the next morning. Whether he got in touch with Schuler the night before does not appear, but it does appear that Schuler was there to meet Rodenkirch; that J. D. Layton happened to drop off the train that very morning; and that the letters from the stranger, Goodhile, and from Rhines were awaiting Layton at the postoffice! Did all this happen by chance? Hardly! One thing is to make such a deal, and quite another to close it; and these experts were not the men to overlook that! They were there, ready to meet an emergency, and the letters were quickly made use of to induce Rodenkirch to confirm the contract by holding up the possibility of exchanging the farm for Canada land. He snapped the bait, the deed was turned over to Layton for some purpose; Schuler was paid $600, as the commission agreed upon, which he divided with Long; and, but for McEwen's inquiring of the cashier at the Castalia bank for the insurance policies, the prompt notice thereof given Rodenkirch, and his equally prompt action in consulting an attorney, the fraud perpetrated must have succeeded.

We have pointed out at least two specific deceptions practiced in this case, to obtain the Castalia property; but, in doing so, it is not to be inferred that a scheme may not be so planned and ingeniously carried out as to enmesh the victim in a net of intrigue, without disclosing any misrepresentation that is actionable, and yet the transaction, as a whole, be so fraught with deceit and permeated with dishonesty as that the courts will grant relief. Though the scheme of the defendants was shrewd, and the finesse of its execution incomparable, the courts should be astute enough to analyze the facts and discover fraud, if perpetrated, and thereby protect the unwary against fraudulent devices, however seductive.

A decree should have been entered as prayed.—*Reversed*.

WEAVER, C. J., GAYNOR and STEVENS, JJ., concur.