**BROCKETT et al. v. WINKLE TERRA COTTA CO. (two cases).**

Nos. 10249, 10324.

Circuit Court of Appeals, Eighth Circuit.

Feb. 12, 1936.

Rehearing Denied March 16, 1936.

Gus O. Nations, of St. Louis, Mo. (J. M. Feigenbaum, of St. Louis, Mo., on the brief), for appellants.

Arthur V. Lashly, of St. Louis, Mo. (Jacob M. Lashly, of St. Louis, Mo., on the brief), for appellee.

Before GARDNER, WOODROUGH, and VAN VALKENBURGH, Circuit Judges.

VAN VALKENBURGH, Circuit Judge.

Appellee is a Missouri corporation with an authorized capital stock of $40,000. It was organized in 1889 by Joseph Winkle. It is engaged in the manufacture and sale of terra cotta, a burnt clay product used as an exterior covering for buildings and for ornamental purposes. Its plant is located in the City of St. Louis, Missouri.

At his death Joseph Winkle left the stock in the company to his children and grandchildren. On December 31, 1929, the net assets of the company amounted to $240,000, and on that date a contract for the sale of all of the stock of the company to one R. F. Grady was authorized. The stockholders sold their stock, aggregating 400 shares, to Grady at $600 per share. The purchase price was paid in the following manner: The sum of $80,000 was paid by Grady in cash, and $160,000 of bonds were duly authorized and issued, secured by a first mortgage on the real and personal property of the company. The cash and bonds were distributed to the shareholders in accordance with their respective interests in the capital stock. Oliver L. Winkle, one of the heirs, refused to accept bonds for his stock, and Grady bought from him $20,000 in bonds to complete the purchase. Grady transferred the stock, except 3 qualifying shares, to Franklin Realty & Building Company, a corporation owned by his wife. The new directors of the Terra Cotta Company were Grady, John G. Hewitt, and J. A. McCarthy. Hewitt is a holder of bonds of the par value of $41,500; McCarthy is trust officer of the Mercantile Commerce Trust Company, trustee under the deed given to secure the bond issue.

In the five years following, the Terra Cotta Company sustained business losses aggregating $143,738.18, as shown by the profit and loss account on the books of the company. In 1934 the loss was '$45,000. The interest on the bonds was paid for 1930 and 1931. The interest payment due January 2, 1933, and all subsequent interest payments, were not made. Some time, apparently in July, 1934, the exact date not appearing in the record, Edith J. Haase, owner of $5,300 worth of bonds and of two years of defaulted interest coupons, brought suit in a state court for foreclosure of the deed of trust securing the bonds, for removal of the board of directors and accounting, and for the appointment, pendente lite, of a receiver of the properties. An order to show cause why a receiver should not be appointed was set for July 17, 1934, in the state court. July 16, 1934, the Terra Cotta Company filed in the District Court of the United States for the Eastern District of Missouri at St. Louis a debtor's petition under sections 77A and 77B of the act to establish a uniform system of bankruptcy as amended (11 U.S.C.A. §§ 206, 207), providing for a corporate reorganization, praying that an order might issue authorizing the said debtor to file and propose a plan of reorganization and for such further orders and directions necessary and incident to the conduct of such proceeding. To the original plan of reorganization objections were filed by Edith Haase, owner of bonds of the par value of $5,300, Bessie L. Brockett, owner of bonds of the par value of $10,000, and by Andrew Winkle, Amelia C. G. Ford, and Joan Winkle Moore, owners of bonds of a par value aggregating $49,900. These objections apparently led to the submission of an amended and modified plan January 17, 1935, in the hope of harmonizing the views of the interested parties. To this plan all the holders of the capital stock of the debtor corporation filed acceptance and approval, as did substantially 88 per cent. of the bondholders, among whom Andrew W. Winkle, Amelia C. G. Ford, and Joan Winkle Moore withdrew their opposition. The plan provided that (1) all general and unsecured creditors should be paid in full; (2) that, for a period of five years from the date of the reorganization approval, the board of directors should consist of five stockholders, two of whom should be selected by the common stockholders, two by the preferred stockholders, and the fifth to be selected by the four already selected; (3) all bonds and the deed of trust securing them to be surrendered by the owners and trustee, canceled, and released; (4) 6 per cent. noncumulative stock, preferred as to income and distribution, be issued in the sum of $180,000 par value, consisting of 1,800 shares of the par value of $100 per share, and that 1 share of such preferred stock be issued and delivered to bondholders respectively for each $100 of par value of bonds and interest surrendered by them for cancellation—the shares of preferred stock, remaining after such distribution, to be held in the treasury of the company. The total principal of bonds outstanding was found to be $153,500, upon which there was accrued interest, as of October 31, 1934, in the sum of $21,490, making a total of bonds and interest of $174,990. The court in approving the plan states that the unsecured indebtedness is $1,572.28. To this amended plan Edith Haase and Bessie L. Brockett, owners of first mortgage bonds of the par value of $15,900 with accrued interest, and Edith E. Winkle, administratrix of the estate of Joseph Byron Winkle, deceased, having matured and unpaid interest coupons

aggregating $546.75, filed objections which by the court were overruled. The assignments of error to the order and decree of the court in approving said plan of reorganization may be summarized as follows:

1. The plan is unfair and inequitable because it destroys the rights of secured creditors and constitutes a taking of property without due process of law.

2. It is unfair because it discriminates against secured creditors and in favor of general creditors.

3. The proposal was not made in good faith, but for the purpose of placing in office and in control of the property those charged with misconduct and with responsibility for the present condition of the company and its business.

4. The plan is not feasible and cannot be put into effect because it authorizes a Missouri corporation to issue fraudulent and fictitious shares of stock without real or adequate values to support such issue, in violation of the charter of the corporation, and of the Constitution and statutory law of the state of Missouri.

5. That, to require a bondholder to exchange his bonds for stock, the par value of which is vastly greater than the value of the bonds or of the property and assets of the corporation which must be the basis of the issue, would compel the bondholder to pay in cash into the company treasury an amount sufficient to satisfy the law of the state conditioning issues of corporate stock, or suffer potential liability to creditors who extend credit upon the faith of such corporate organization.

■ It may well be that, ordinarily a plan which discriminates against secured creditors in favor of general creditors contains elements of unfairness. However, in this instance the claims of the general creditors are found to amount to but $1,575.28, a sum too negligible in itself to warrant the rejection of the plan if otherwise unobjectionable.

■ It is charged that the proposal of the debtor was not made in good faith, because its object was to place and perpetuate the control of the properties and business in officers and directors, who are charged by objectors with misconduct in office and responsibility for the present financial condition of the company. The plan proposes that two directors shall be selected by the common stockholders, two by the preferred stockholders, and a fifth by the four so chosen. The common stock is held almost wholly by Grady and the Franklin Realty Building Company; the majority of the preferred stock likewise is held by the former management and those under its control. The charge that that management is left potentially, if not actually, in control seems sustained by the record. The charges of misconduct made against the officers and directors of the old company are not properly susceptible of determination in this form of action and upon this record.

■ Appellants assert that the plan is unfair and inequitable because it destroys the rights of secured creditors and constitutes a taking of property without due process of law. Where the fairness of a reorganization plan is seasonably challenged by objections, the action of the trial court is subject to review; but, when a matter is committed to the final discretion of a chancellor, his determination thereon will not be set aside unless clearly shown to be erroneous or improvidently granted. Kansas City Terminal R. Co. v. Central Union Trust Co. (C.C.A.8) 28 F.(2d) 177; Continental, etc., Bank v. Chicago, Rock Island & Pacific Ry. Co., 294 U.S. 648, 677, 55 S. Ct. 595, 79 L.Ed. 1110. It is, of course, true that the right of a mortgagee to insist upon full payment before giving up his security has been deemed of the essence of a mortgage, as stated by Mr. Justice Brandeis in Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555, 580, 55 S.Ct. 854, 79 L. Ed. 1593, 97 A.L.R. 1106.

"The obligations of a contract are impaired by a law which renders them invalid, or releases or extinguishes them (Sturges v. Crowinshield, supra, 4 Wheat. [122] pages 197, 198, 4 L.Ed. 529) and impairment, as above noted, has been predicated of laws which without destroying contracts derogate from substantial contractual rights." Home Building & Loan Association v. Blaisdell, 290 U.S. 398, 431, 54 S.Ct. 231, 237, 78 L.Ed. 413, 88 A.L.R. 1481.

■ That decision concerned a Minnesota statute; but, while the bankruptcy power is subject to the Fifth Amendment, under it Congress, unlike the states, is not prohibited from impairing the obligation of contracts. Louisville Joint Stock Land Bank v. Radford, supra. It cannot, however, take for the benefit of the debtor rights in specific property acquired by the creditor prior to the act. Id., 295 U.S. 555, loc.cit. 602, 55 S.Ct. 854, 79 L.Ed. 1593, 97 A.L.R. 1106. But while it is true that private

property shall not be taken even for a wholly public use without just compensation, it is held that "in no just sense do such government regulations [respecting the confirmation and legalization of a plan of reorganization] deprive a person of his property without due process of law." Continental, etc., Bank v. Chicago, Rock Island & P. Ry. Co., supra, citing Canada Southern Ry. Co. v. Gebhard, 109 U.S. 527, 3 S.Ct. 363, 27 L.Ed. 1020.

In Warner Bros. Pictures, Inc., et al. v. Lawton-Byrne-Bruner Insurance Agency Company, 79 F.(2d) 804, 810, this court, speaking through Judge Stone, has stated the problem succinctly:

"Reorganization of distressed corporations is primarily and principally a business (economic) problem. It is a means whereby those variously interested financially in a distressed business seek, through continuance of that business as a going concern, to work out for themselves more than they could gain by sale of the assets or of the business to others. Reorganization is occasioned by the situation that the business cannot go on as it is. If it is to continue in control of all or of some of those financially interested in it, a readjustment is necessary. Such readjustment involves suspension or alteration of some or all existing legal interests in the business and property and may involve extinguishment of some interests. It is only because of such changes in legal rights that the matter of reorganization comes into courts."

And again:

"Obviously, this problem involves consideration and determination of many matters related to the particular business and is very largely a problem individual to the particular business. Among other elements, it involves an understanding of how and why the business came into difficulty; of what the difficulty is; of the present condition of the business and of the property; of whether there is a fair prospect that the business can be continued under some readjustment of rights; of what readjustment is workable to that end. Such understanding requires knowledge of the financial, management, and business history of the concern; of the extent, character, and condition of both assets and liabilities; of the past, present, and probable prospective earnings and expenses. Based upon such knowledge and understanding, a plan must be evolved which offers a reasonable prospect of success. In working out such plan,

the rights of interested parties must be preserved through a 'fair' right of participation therein."

And as well stated by the learned trial judge in another reorganization case brought to the attention of this court, in Re Sefton National Fibre Can Co., 13 F.Supp. 83, "the outstanding purpose of the Amended Act, upon which this case rests, was to afford aid in the effort to rehabilitate corporations solvent in fact but unable to meet maturing obligations." It was not the purpose to lend its aid generally and without discrimination to corporations hopelessly insolvent, and without legal resources to prosecute their business with reasonable prospect of success.

The value of the assets of the Winkle Company at the time of the reorganization may sufficiently be gathered from the record. Grady estimates that the plant, ovens, and buildings at a knock-down sale or auction sale would not bring more than $25,000. To this statement the court made this remark:

"I think Mr. Grady is optimistic when he says he can sell for $25,000.00. That neighborhood has deteriorated a great deal in a business way in the last few years. It used to be a beehive of activity * * * and now it is like a dead one."

The St. Louis Terra Cotta plant is in the next block. Grady was offered a one-third interest in that plant for $8,000. John G. Hewitt, the secretary of the Winkle Company, and a member of the board of directors, says that at a foreclosure sale "or any sale," "I don't think the fixed assets of the company would bring over fourteen or fifteen thousand dollars; that would include the buildings, the ground, and the mining property; I think it would all bring only fourteen or fifteen thousand dollars." The trial court found that, as a going concern, the assets of the debtor-petitioner have a "book value" of an amount sufficient to warrant an increase of the capital stock by the authorization and issuance of 1,800 shares of preferred stock of the par value of $100 each, in addition to the outstanding common stock. This book value is disclosed by the testimony of Grady to have been presented in a statement which he made without examination or appraisal, depending upon the accuracy of accountants. "I just took the figures off the books at the figures they have been carried at for many years." The witness was unable to furnish

any estimate of the actual value, but was of opinion that none of the items had an actual or cash value approaching that contained in the inventory. In this he was substantially corroborated by Secretary Hewitt. Grady further testifies that the losses sustained by the company in 1930, 1931, 1932, and 1933 aggregated $98,738. "The total loss in 1934 was approximately $45,000.00. There was a change in the book value of the inventory which was not salable at the price that it was appraised. The stock we carry today would sell for less than the inventory price. There are quite a number of items that are older than five years." The actual value of the entire assets of the company when purchased by Grady at the beginning of 1930 is conceded to be $240,-000. Losses during the next five years aggregated $143,738.18, leaving a worth according to the company's books, January, 1935, of $96,261.82. But, as has been stated, the actual value of the assets was much less than that figure. Appellant insisted throughout that the maximum value of company assets did not exceed $30,000 at the date the plan of reorganization was approved, and this contention was not seriously challenged by counsel for appellee in brief or argument. The company is left practically without working capital. The transfer of the bondholders to the position of preferred stockholders, while canceling the bonded indebtedness, added no new funds to the corporate treasury. If the company could enjoy any business through the operation of its plant, it must at once borrow sufficient money to finance that business. But the plan holds out no roseate hope for seasonable business recovery. It says:

"It is believed by the Debtor, and so represented to the bondholders, the stockholders and to the court, that the company will be able to endure the loss of business incident to the economic depression for a few more years in the hope that returning prosperity and building construction demands will create business out of which the company can produce satisfactory profits to take up again its burdens which it is now temporarily unable to carry; that if the corporate and debt structure shall be reorganized so as to release the company from its bonded indebtedness and the mortgage upon its property its financial position would justify a line of bank credit sufficient to prepare for, make up and fill any orders it may be able to obtain."

The witness Davis, a grandson of Joseph Winkle, who confesses to a small financial interest in the company, but "a definite sentimental interest," says:

"I don't think anybody can guarantee there is going to be any relief for the present situation of this company. I realize that under this plan the bondholders may never be paid one dollar on their principal."

It is apparent that this plan has been devised in the somewhat slender hope that expected losses sustained during a few years more may be endured until prosperity returns. It is inferrable that the sentimental interest described by the witness Davis, coupled with the probable small return to be realized from liquidation, was largely influential in moving a majority of the bondholders to accept the proposed plan. And this brings us to the consideration which, in our judgment, renders this reorganization plan obviously nonfeasible, and unfair to these objectors. We have here a proposed new issue of stock in a par value amount greatly, if not many times, in excess of the actual value of the assets which must form the lawful basis of its issue. The pertinent citations from the Missouri Constitution and statutes follow. Section 8 of article 12 of the Constitution of the state of Missouri reads thus:

"*Stock and bonded debt, how issued or increased.*—No corporation shall issue stock or bonds, except for money paid, labor done or property actually received, and all fictitious increase of stock or indebtedness shall be void. The stock and bonded indebtedness of corporations shall not be increased, except in pursuance of general law, nor without the consent of the persons holding the larger amount in value of the stock first obtained at a meeting called for the purpose, first giving sixty days' public notice, as may be provided by law."

The applicable sections of the Revised Statutes of Missouri (Mo.St.Ann. §§ 4546, 4572, 4574, pp. 1994, 2016, 2020) are the following:

"§ 4546. *Stock and bonds, for what issued—capital stock, how increased—fictitious issues void.*—The stock or bonds of a corporation shall be issued only for money paid, labor done or money or property actually received."

"§ 4572. *Execution may issue against stockholders, when.*—If any execution shall have been issued against any corporation, and there cannot be found any property or

effects whereon to levy the same, then such execution may be issued against any of the stockholders to the extent of the amount of the unpaid balance of such stock by him òr her owned."

"§ 4574. *Suit may be brought against former stockholders, when.*—If any company formed under this chapter dissolve, leaving debts unpaid, suits may be brought against any person or persons who were stockholders at the time of such dissolution, without joining the company in such suit; and if judgment be rendered and execution satisfied, the defendant or defendants may sue all who were stockholders at the time of the dissolution, for the recovery of the portion of such debt for which they were liable."

In the Warner Bros. Pictures Case cited above, Judge Stone said: "It must be conceded that it is necessary for the reorganizers to comply with these requirements of the state law in the issuance of the stock and bonds provided for in the plans." The unambiguous language of Constitution and statutes finds unqualified support in the decisions of the highest court of the state. It will be necessary to confine citations to but a few:

"Corporations: Payments of stock with property: Actual value. Property may be taken in payment of the capital stock of a corporation; but such property must be taken at a fair, just, lawful, bona fide valuation. The owners of such property or subscribers to such stock can not put in their property or labor at any valuation they may put upon it, but the corporation must receive in property or labor what it is reasonably worth in money. Nor is this rule relaxed by the fact that the corporators did not intend any fraud on the creditors of the corporation.

"Purchase of stock by third parties: Notice. And purchasers of such stock, knowing that the property turned over to the corporation was valueless, or had been taken as a mere speculation, will be held to a compliance with such rule to the same extent as will the original subscriber. * * *

"Rights of creditors. When a corporation is sent forth into the commercial world, accredited by the stockholders as possessed, in money or its equivalent in property, of a capital equal to the par value of its capital stock, every person dealing with it, unless otherwise advised, has a right to assume that such stock has been fully paid and to extend credit to it in the belief that

the money or its equivalent in property will be forthcoming to meet his legitimate demands. Nor will such stockholder be relieved of his duty to respond to the creditor for the difference between the par value of the stock and what he actually paid for it, by the fact that he believed or had reason to believe that the property turned over by him to the company was equal to the par value of the stock received by him. (Shickle v. Watts, 94 Mo. 410 [7 S.W. 274], approved, and Woolfolk v. January, 131 Mo. 620 [33 S.W. 432], distinguished.)" Van Cleve et al. v. Berkey et al., 143 Mo. 109, 44 S.W. 743, 42 L.R.A. 593.

The same interpretation is expressed in Berry v. Rood et al., 168 Mo. 316, 67 S.W. 644, in the following language:

"When property is taken in payment of stock of a corporation the stockholder is liable at the suit of a creditor of the company without notice, to account for the difference between the true value of the property and the face value of the stock. And this is the Missouri Constitution and statutes even though no actual fraud be shown."

In Hodde v. Hahn, 283 Mo. 320, 222 S.W. 799, it is held that the burden is thrown upon the stockholders sued for unpaid stock subscriptions to prove that the property, substituted for money in their payment for stock subscribed, was equal in money value to the par value of the stock. It is further held that a receiver is not estopped to maintain an action for unpaid stock subscriptions represented to be fully paid up, where there has been a transfer to a trustee "of all the properties and business of a corporation in financial straits, whose assets were practically worthless, except that it was still a going concern, the purpose being to permit the trustee to continue to operate the business in the hope that the returns might result in the payment of its debts, though such transfer proved to be a mistake."

In Strong v. Crancer, 335 Mo. 1209, 76 S.W.(2d) 383, decided November 16, 1934, the Supreme Court of Missouri holds that a creditor deals with a corporation upon the assumption that its stock is fully paid up, and that "every person dealing with a corporation unless otherwise advised has a right to extend credit to it on the faith of the fact that its capital stock has been paid and that money or its equivalent will respond to a legitimate command." The same rule prevails in the Supreme Court of the United States. The stock subscribed is considered in equity as a trust fund for the

payment of creditors. "The creditor has, therefore, the right to presume that the stock subscribed has been or will be paid up, and if it is not, a court of equity will at his instance require it to be paid." Scovill v. Thayer, 105 U.S. 143, loc. cit. 154, 26 L.Ed. 968. Compare New Albany v. Burke, 11 Wall. 96, 20 L.Ed. 155; Hawkins v. Glenn, 131 U.S. 319, 9 S.Ct. 739, 33 L.Ed. 184; and Richardson v. Green, 133 U.S. 30, 45, 10 S.Ct. 280, 33 L.Ed. 516.

"Capital stock or shares of a corporation—especially the unpaid subscriptions to such stock or shares—constitute a trust fund for the benefit of the general creditors of the corporation. * * *

"The relations of a stockholder to the corporation, and to the public who deal with the latter, are such as to require good faith and fair dealing in every transaction between him and the corporation, of which he is part owner and controller, which may injuriously affect the rights of creditors or of the general public, and a rigid scrutiny will be made into all such transactions in the interest of creditors." Sawyer v. Hoag, 17 Wall. 610, 21 L.Ed. 731.

To meet the claim of appellants that this additional stock issue violates the fundamental law of Missouri as above set out, counsel for appellee maintain that where "a debtor corporation becomes financially embarrassed after having carried on business for a period of time subsequent to its creation, it may lawfully increase and issue additional capital stock at less than par value, pursuant to a plan of reorganization for the purpose of enabling it to resume business; and stock so issued does not violate a constitutional or statutory provision which inhibits a corporation from issuing stock except for money paid, labor done, or property actually received." A number of cases cited, assumed to be in support of this position, will require analysis. The situations in such citations present no pertinent analogy to that of the case before us.

In Memphis & Little Rock Railroad Co. v. Dow, 120 U.S. 287, 300, 7 S.Ct. 482, 30 L.Ed. 595, the court had under consideration an Arkansas statute which provided that "no private corporation shall issue stocks or bonds, except for money or property actually received or labor done; and all fictitious increase of stock or indebtedness shall be void." Const.Ark. 1874, art. 12 § 8. In the reorganization then before it the Supreme Court held that "it is sufficient to say that this statute has no application to the present case; for there was here no increase of the existing capital stock of a corporation, nor were the bonds secured by the mortgage of May 2, 1877, executed for money borrowed, but for property, rights, and privileges conveyed to appellant at an agreed price, to be paid in its stock and bonds."

In Ingraham v. Commercial Lead Co. (C.C.A.8) 177 F. 341, 343, it was held that a corporation which is a going concern, but which has become insolvent and without credit and its stock of no value, may lawfully, in good faith issue new stock to its old stockholders as a bonus for loans made to it to pay its debts and enable it to resume business. There was here involved a mine susceptible of being, and in good faith thought to be, of great value. The stock was increased by $40,000. Certain of the directors and old stockholders loaned $75,000 to the company for the said purposes and received the notes of the company, and 50 per cent. of the amount loaned by them in the increased stock. The money was consumed in paying old debts, and in an attempt to resume mining operations. The result was a failure. The court held that the defendants were not liable on this stock received as a bonus, for the reason that the $75,000 loan to the corporation by defendants "was the full equivalent of the actual value of the notes and stock of the company received by them."

In Thomas & Brenneman et al. v. Goodman (C.C.A.6) 254 F. 39, 40, it was held generally that "where an Ohio corporation, on account of impairment of its capital stock, necessarily issues additional stock, stockholders who purchased such stock below par at its market value will not be held liable to creditors or other stockholders for the difference." This additional stock was sold to the directors, or those active in the management of the corporation, many of whom had already advanced considerable sums by way of loans. In each case the purchase was made at the real worth or market value of the stock. The transaction was upheld upon the authority of Handley v. Stutz, 139 U.S. 417, 11 S.Ct. 530, 35 L.Ed. 227, Clark v. Bever, 139 U. S. 96, 11 S.Ct. 468, 35 L.Ed. 88, and Fogg v. Blair, 139 U.S. 118, 11 S.Ct. 476, 35 L. Ed. 104, cases which we shall presently consider.

In Speer v. Bordeleau, 20 Colo.App. 413, 79 P. 332, a corporation which had become financially embarrassed increased its

capital stock and put the new shares upon the market at the best price that could be obtained. Inasmuch as the consideration obtained represented the actual value of such stock, the purchasers were held not liable for the difference between the par value and the purchase price. The real value of the stock was paid into the corporation to enable it to go on with its business, and the transaction of buying on the market, at the actual market value, was a bona fide one on the part of the purchaser. In Lucey Company v. McMullen, 178 Cal. 425, 173 P. 1000, it was held that where stock is issued for property having, as here, a defined value, creditors may have recourse against a stockholder for the amount paid less than the par value. In the present case the preferred bondholder who assents to the plan takes by issue as a subscriber instead of as a purchaser. It is well settled that an arrangement, whereby it is contracted between the company and a stockholder who has taken shares purporting to be paid up, but not paid up, that such stockholder shall never be called upon to pay any further assessments, though binding on the company, may be set aside as a fraud in law on its creditors. Richardson v. Green, 133 U.S. 30, 45, 10 S.Ct. 280, 33 L.Ed. 516.

In Clark v. Bever, an Iowa railroad corporation, being indebted to a construction company in the sum of $70,000 which it was unable to discharge in money, made a settlement with the creditor whereby the latter received stock of the company of the par value of $350,000 in payment of its claim. The stock was taken at 20 cents on the dollar, but was not at the time worth anything in the market. A bondholder subsequently sought to charge a member of the construction company, who had received 910 of these shares as his part of the payment, with liability for the difference between the par value and the amount paid for the stock. The holding of the Supreme Court was that "while the capital stock of a corporation, especially its unpaid subscriptions, is a trust fund sub modo for the benefit of its general creditors, a corporation— no statute forbidding—may in good faith sell or dispose of its stock to creditors in discharge of their debts." The court, however, expressly reaffirmed the principle "that when the interest of the public or of strangers is to be affected by any transaction between the stockholders owning the corporation and the corporation itself, such transaction should be subject to a rigid scrutiny," thus expressly disclaiming any purpose to modify in any respect the principles laid down in prior cases cited, nor the salutary rule announced in Sawyer v. Hoag, supra, for the protection of the public, third persons and strangers.

Fogg v. Blair, 139 U.S. 118, 11 S.Ct. 476, 477, 35 L.Ed. 104, was an appeal from the circuit court of the Eastern District of Missouri (Blair v. St. Louis, H. & K. R. Co., 25 F. 684, rehearing denied 27 F. 176), and involved the law of that state. This was a suit brought against contractors for the construction of a railroad to hold them liable for the face value of stock received by them in payment for work done. The merits of the case were not passed on, because the bill of complaint was held bad on demurrer for failure to state the ultimate facts upon which charges of "fraud," "breach of trust," etc., were based. The court, however, announced the settled law as declared by the Supreme Court of Missouri and by the Supreme Court of the United States in no uncertain terms:

"It is the settled doctrine of this court, as well as of the supreme court of Missouri, that unpaid subscriptions to the stock of a corporation constitute a trust fund for the benefit of its creditors, which may not be given away or disposed of by it, without consideration or fraudulently, to the prejudice of such creditors."

While it is competent for a railroad corporation in Missouri, exercising good faith, to use its bonds and stock in payment for the construction of its road, it could not rightfully, at least, as against creditors or stockholders, issue its stock to contractors as full paid, without getting some fair or reasonable equivalent for it. What is such equivalent depends primarily upon the actual value of the stock at the time it was contracted to be issued, and upon the compensation which, under all the circumstances, the contractors were equitably entitled to receive for the particular work undertaken or done by them. The corporation could not, by its directors, sell or dispose of its assets to the prejudice of creditors and stockholders, under such circumstances, on such terms, and at such prices as indicated, upon the face of the transaction, that they were being squandered recklessly or fraudulently in disregard of the trust committed to them.

In Handley v. Stutz, 139 U.S. 417, 11 S. Ct. 530, 35 L.Ed. 227, the Clifton Coal Com-

pany, a Kentucky corporation, with a capital stock of $120,000, needed $50,000 with which to erect coke ovens, buildings, etc., to further develop its property. It was resolved to issue $50,000 of bonds in sums of $1,000 each. A mortgage to secure them was executed and recorded. It was found that the bonds could not be sold; therefore the company borrowed a large amount of money upon its notes, indorsed by directors and stockholders. To secure the lenders and indorsers, the $50,000 of bonds were deposited in banks as additional collateral security for the loans. In order to effect a sale of the bonds, it was found necessary to propose to purchasers to give, as gratuity, or bonus, $1,000 of stock with each $1,000 bond. To accomplish this the capital stock of the company was increased to $200,000, making an increase of 800 shares of the par value of $100 each. A contract was executed and delivered to the company by certain purchasers of the bonds, afterwards made defendants in that action. This contract contained the following terms: "We, the undersigned, subscribe for the amount set opposite our names respectively, to bonds of the Clifton Coal Company, aggregating $50,000.00. It is agreed that $50,000.00 capital stock be distributed pro rata among the subscribers to the above bonds." $45,000 of said bonds were in fact subscribed for, and distributed, and certificates of stock reciting that said shares were fully paid up and nonassessable were received by said subscribers. Nothing was, or ever had been, paid for or upon any of the shares of capital stock, as such, thus subscribed for. $5,000 of the bonds, not subscribed for, were left in bank as collateral security for a loan. The remaining 300 shares of stock of the par value of $30,000, which were not needed to secure the subscribers to the bonds, were distributed pro rata among the old stockholders. A creditor's bill was filed against the coal company and the holders of this increased stock to compel payment therefor in satisfaction of judgments against the company. The general holding of the court is succinctly stated in the syllabi:

"When a stockholder in a corporation who assents to an increase in the capital stock of the corporation and its gratuitous distribution among the shareholders, receives such stock as full paid stock, an obligation arises to pay for it in full, when called upon to do so by creditors whose debts are subsequent to the authorization of the increase: but this equity does not exist in favor of a creditor whose debt was contracted prior to such authorization.

"An active corporation, finding its original capital impaired by loss or misfortune, may, for the purpose of recuperating itself, and of producing new conditions for the successful prosecution of its business, issue new stock, and put it upon the market, and sell it for the best price that can be obtained: and in such case no such trust in favor of a creditor arises against the purchaser who, in good faith, buys for less than par."

The following language in the body of the opinion is especially significant:

"So far as the question of liability to the proposed assessments is concerned, these defendants, with respect to their relations to this corporation, are divisible into two distinct classes: First, those of the original stockholders who received the $30,000 increased stock as a gift; second, those who subscribed to the $50,000 bonds, and received an equal amount of stock as a bonus or inducement to make the subscription.

"With regard to the first class, namely, the original stockholders, who voted for this increase of 800 shares, and then distributed among themselves 300 of those shares without the shadow of right or consideration, it is difficult to see why they should not be called upon to respond for their value. * *

"If the corporation has no right as against creditors to sell or dispose of this stock with an agreement that no further assessment shall be made upon it, much less has it the right to give it away, or distribute it among shareholders, without receiving a fair equivalent therefor, and thereby induce the public to deal with it upon the credit of such shares, as representing the assets of the corporation. * * *

"If it be once admitted that a corporation may issue stock without receiving a consideration therefor, and where it does not represent actual or substituted value in corporate assets, there is apparently no limit to the extent to which the original stock may be 'watered,' except the caprice of the stockholders. While an agreement that the subscribers or holders of stock shall never be called upon to pay for the same may be good as against the corporation itself, it has been uniformly held by this court not to be binding upon its creditors."

There is much additional language in the opinion to this same effect, but further quotation is deemed unjustified.

 From the foregoing it is apparent that new stock may be issued by a corporation for purposes of reorganization, or to enable it to continue in business, providing it has a fair basis of value, as required by corporate law, is sold to a purchaser at its real worth or fair market value, or is taken as security for loans made in good faith and as a fair equivalent in actual value for the stock received in return. We have been referred to no case where stock has been permitted to be issued "without the shadow of right or consideration" and where it "does not represent actual or substituted value in corporate assets." It is, of course, urged that the cancellation of the bonded indebtedness constitutes a consideration for the stock issued to the bondholders. This may be true as between the corporation and assenting stockholders, but it cannot be held binding upon creditors who deal with the company upon the faith of its capital stock. No new money or its equivalent accrues to the Terra Cotta Company by virtue of the transaction. Not a dollar has been added to the physical assets of the corporation by this additional stock issue. One who assents to that issue and accepts the certificates stands in the same relationship to the public as that assumed by an original subscribing stockholder. The reorganized company, in its application for credit, differs in no respect from a newly organized corporation with no indebtedness and with a capital stock of $220,000, based upon an actual value of money or property received, of $30,000, certainly less than 50 per cent. of the stock outstanding if the questionable book value is to be indulged. It is obvious that no original organization of this nature could escape the claims of creditors who had suffered loss by lending credit upon the faith of its capital stock.

And it is the avowed purpose of the plan to seek credit and to borrow money upon the faith of this stock issue. It is not proposed to offer that stock for sale upon the market at its real worth. As stated in the plan, "it is believed * * * that its financial position would justify a line of bank credit sufficient to prepare for, make up, and fill any orders it may be able to obtain." The witness Davis, on behalf of the debtor-petitioner, says: "It seems to me this company can handle its credit situation by getting rid of this bond issue and then going to the banks on its individual orders." By this means, notwithstanding the fact that the terra cotta business is admitted to be at a standstill, two other local companies being out of business or in liquidation, it is hoped "that the company will be able to endure the loss of business incident to the economic depression for a few more years."

We may lay on one side the question of whether the financial responsibility of stock in an uncertain business venture may fairly be substituted for a first mortgage lien against the protest of the lienor. The paramount question here is whether these objecting bondholders may be forced into the position of holders of stock issued for an inadequate consideration, and thereby exposed to possible if not probable financial responsibility and loss. We do not think so. Without impugning the motives of the proponents of the plan, we feel that potentially it may affect injuriously the rights of creditors and of the public generally, and is, therefore, nonfeasible and unfair to these objectors as well. The small value of the physical property involved, and the large percentage of acceptance on the part of the stockholders and bondholders, no doubt operated in the trial court to obscure this issue which, we think, conditions the disposition of this appeal.

Counsel for appellee call attention to section 4958, R.S.Mo.1929 (Mo.St.Ann. § 4958, p. 2270), which provides for the conversion of the bonds of a corporation into its stock upon terms to be agreed upon between bondholders and company, "provided such shares of stock shall not be valued at less than their market or actual value." It is manifest that this section is not to be considered as at variance with the general Missouri law affecting the issue of corporate stock.

It follows that the appeal in No. 10,324 allowed by the District Court, is dismissed, and that the decree below in No. 10,249, is reversed and the cause remanded to the district court for further proceedings not inconsistent with this opinion.