## SOPHIAN et al. v. CONGRESS REALTY CO.*

### No. 11111.

Circuit Court of Appeals, Eighth Circuit.

Aug. 24, 1938.

Bertram H. Ross, of Kansas City, Mo. (Butler Disman and Maurice Weinberger, both of Kansas City Mo., on the brief), for appellants.

Dupuy G. Warrick, of Kansas City, Mo. (R. B. McCreight, of Kansas City, Mo., Charles H. Luecking, of St. Louis, Mo., Borders, Borders & Warrick, of Kansas City, Mo., and Taussig & Luecking, of St. Louis, Mo., on the brief), for appellee.

Before STONE, SANBORN, and VAN VALKENBURGH, Circuit Judges.

SANBORN, Circuit Judge.

The appellants, who own bonds, preferred stock and common stock of Congress Realty Company (hereinafter referred to as the debtor), a Missouri corporation which owns and operates a five-story office building and garage at 3525-35 Broadway Boulevard in Kansas City, Missouri, have appealed from an order confirming a plan of reorganization of that company under Section 77B of the Bankruptcy Act, 48 Stat. 911, 912, as amended, 11 U.S.C. § 207, 11 U.S.C.A. § 207. The broad question presented is whether the plan approved is fair, nondiscriminatory and feasible.

The petition for reorganization of the debtor, filed March 8, 1937, alleged that the land and building owned and operated by it cost (less reserve for depreciation) $438,-765.45; that it has, in addition, cash and receivables $21,184.61, inventory $2,423.-69, prepaid insurance and water, gas and light deposits $2,714.85, and furniture, fix-tures, etc., $7,447.13; that its liabilities are: First mortgage bonds $319,500, accrued and unpaid interest thereon $60,705, past due taxes $22,500, estimated current taxes (1937) $6,000, and accounts and notes pay-

able $3,302.31; that it has outstanding $19,-980 of preferred stock (19,980 shares of $1 par value, non-voting) and $12,000 of common stock (12,000 shares of $1 par value); that it is without funds to pay taxes or bond interest or to meet the sinking fund requirements of the deed of trust securing its bonds, under which $20,000 should have been deposited; that its secured creditors might foreclose and thereby obstruct its business; that, upon information and belief, its assets are fairly worth the amount of its indebtedness, but if sold at forced sale would not pay its creditors; and that it is unable to meet its debts as they mature. The court approved the petition as properly filed, and continued the debtor in possession and control of its property and business.

On July 27, 1937, the court of bankruptcy, evidently to prevent the debtor's real estate from being sold for taxes, authorized it to borrow $17,000 with which to pay taxes, and to give to the lender a deed of trust upon its property, superior to the deed of trust securing its bonds.

On November 6, 1937, the debtor filed the plan of reorganization here complained of. This plan recites that the principal asset of the debtor is the office building and garage; that the garage has storage capacity for 450 automobiles; that the first floor of the office building is occupied by stores and the upper floors are "equipped for business offices"; that on December 1, 1931, the debtor issued $319,500 of 6% bonds maturing December 1, 1941, secured by a deed of trust; that it has paid no interest on these bonds since they were issued, and has failed to comply with the sinking fund requirements of the deed of trust to the extent of $20,000; that the building and garage have been efficiently operated and maintained in first-class condition out of operating revenues; that since September, 1936, earnings have been in excess of operating expenses and taxes; that a foreclosure would serve no useful purpose and would be expensive and burdensome to bondholders and stockholders; that the securities to be dealt with upon reorganization are: Bonds ($319,500), preferred stock (19,980 shares), and common stock (10,200 shares). The plan then proposes that the bondholders shall waive the more than $60,000 of interest due them, and accept new mortgage bonds equal in principal amount to the bonds they have; that the new bonds shall bear interest at

4%—payable during the first five years annually out of net income, if any, and shall mature January 1, 1953; that net income in excess of 4% shall be placed in a sinking fund for the benefit of bondholders; that new preferred stock shall be issued for old preferred stock, but shall have the right to vote; that new common stock shall be issued for old common stock; that all voting stock shall be deposited in a voting trust terminating at the time the bonds mature; that the trustees of the voting stock shall vote all of the stock in favor of any sale of the debtor's assets which they approve unless 40% of the bondholders file objections thereto, and that the trustees shall vote in favor of any sale of such assets which is approved by two-thirds of the bondholders.

The appellants filed objections to the plan on November 24, 1937, on the ground that it was unfair, inequitable, discriminatory, and not feasible. They asserted, in substance and effect, that the assets of the debtor, at a fair valuation, were insufficient to pay its debts; that the common and preferred stock were worthless; that the plan proposed took nothing from common stockholders, while it required bondholders to waive more than $60,000 of interest and to surrender 6% bonds for 4% bonds, the interest on which for five years would only be paid if earned; that all stockholders are not bondholders; that the property in equity belonged to the bondholders; that, since the present common and preferred stock of the debtor are utterly worthless, the substitution of new stock therefor would be in violation of the laws of Missouri (see Brockett v. Winkle Terra Cotta Co., 8 Cir., 81 F.2d 949, 955); that the power given to the voting trustees to sell the assets of the debtor unless 40% of the bondholders object, is equivalent to an absolute power of sale, and that the power given to two-thirds of the bondholders to compel the trustees to sell is ineffectual, since the bondholders are scattered and unorganized.

The court below heard the objections to the proposed plan on November 27, 1937, and on November 30, 1937, filed an order or opinion to the effect that if the plan was approved by the requisite number of security holders, the court perceived nothing which would require its disapproval.

Thereafter the appellants moved for an appraisal of the debtor's real estate by

a competent appraiser to be appointed by the court, and also filed a petition for an audit. On January 13, 1938, the court denied the appellants' applications for an appraisal and an audit.

On January 17, 1938, the court filed an opinion[1] confirming the plan, and on January 20, 1938, the requisite number of consents having been filed, entered the order of confirmation from which this appeal is taken.

The financial history of the debtor cannot be accurately ascertained from the record. From what the record contains, helped out by statements of counsel in their briefs, which are not disputed, we gather that the debtor is the successor of the Congress Building Company, which in or about 1926 acquired the land and building here involved at a total cost asserted to be $468,765.45, of which $375,000 was raised by selling bonds to the public; that by January 15, 1931, the bonded indebtedness of the Congress Building Company was $338,000, and default had already occurred in the payment of interest; that a bondholders' protective committee was formed; that foreclosure proceedings were had, and on September 29, 1931, the property was bid in for the bondholders for $100,000; that the Congress Realty Company, the present debtor, was then formed and the property conveyed to it under a plan of reorganization; that under that plan the debtor issued the bonds, the preferred stock, and the common stock now outstanding; that the bondholders paid the expenses of their committee and received all of the bonds, all of the preferred stock, and 6,660 shares (55½%) of the common stock; that 1800 shares of common stock (15%) went to the manager of the building, 2940 shares (24½%) went to the trustees of the voting trust, who were to hold and vote the common stock for a ten-year period, and 600 shares (5%) went to the attorney for the voting trustees; that the manager of the building later turned back the 1800 shares which he had received, leaving a total of 10,200 shares of common stock in the voting trust, of which the present bondholders own 65%/₁₀% and the voting trustees and their attorney 34⁷/₁₀%; that since the reorganization in 1931, the debtor's earnings have been insufficient to meet its operating expenses and taxes; that it suffered an operating loss of $20,398.59 in the fiscal year ending September 30, 1936; that in 1931 the bondholders' committee, in connection with the reorganization effected in that year, had advised the bondholders that the common stock was valueless and that whatever potential value it might possess would depend upon the efforts of the new management.

There are two opposing interests in these proceedings: The bondholders, who have a lien upon the property and who own all of the preferred stock and a majority of the common stock; and the common stockholders (the voting trustees and their attorney), who own no bonds, but who, by means of the voting trust, have been able to retain the control and management of the property. If the bondholders owned all of the common stock, or if the minority stock interest had been eliminated, there would have been no necessity for

---

[1] "The Plan of Reorganization submitted has received the approval of a substantial majority of the bondholders and of others entitled to be consulted. Congress intended that such a fact should have great weight with the Judge in determining whether the plan should receive his confirmation. In this proceeding, moreover, the only objection to the plan (it has been most ably and fairly presented) comes from the owner of bonds in a comparatively small amount.

"The whole purpose of the act under which this proceeding was instituted is to enable a going concern to continue in the face of possibly temporary financial difficulties, to avoid a liquidation of its assets and the destruction of one of its greatest assets, its good will. Of course, it is not the purpose of the act that a creditor shall be called upon to sacrifice any part of his property to a stockholder.

The objector contends that that is done here.

"The bonds which the objector owns are not now worth anything like their face. That is conceded. If the business were liquidated the objector would sustain a real loss. The majority believes that loss will be less if the business is continued. The stockholders especially are concerned with continuing the business. The plan of reorganization gives them an incentive. The fact that in a forced liquidation the bondholders would receive everything (but far less than the amount due them) and the stockholders nothing, does not make unfair a plan which gives the stockholders something and the bondholders more than they would get on liquidation.

"Other objections have been considered.

"The plan should be confirmed. It is confirmed. So ordered."

these reorganization proceedings. Therefore, it seems apparent that the proposed plan is nothing more than a scheme of the minority stockholders, who own no bonds, to retain control of this property, which, because of its inability, under their management, to earn a sufficient amóunt to pay debts and fixed charges, and because the assets of the debtor are, rather obviously, worth less than the liens against the property, belongs in equity to the bondholders. The proponents of the plan made no showing which would justify a belief that the common stock has any value, present or potential, or that there is any prospect that either the value or the earning power of the property is likely to increase. They introduced no evidence that the property could not be as well managed if the bondholders were to take it over; and there is certainly nothing so difficult about operating a garage or office building as to cause any fear of loss of good will or going-concern value because of a change of management. Compare In re Barclay Park Corporation, 2 Cir., 90 F.2d 595, 598. Failure for a period of years to meet current taxes and fixed charges is not usually regarded as a badge of capable and efficient operation or of great going-concern value.

This plan was not shown to be fair, equitable, feasible and nondiscriminatory, and it should not have been confirmed.

■ Section 77B cannot be used to aid stockholders at the expense of bondholders or other creditors, or for the purpose of continuing in business a corporation hopelessly insolvent and unable to prosecute its business with any reasonable prospect of success. Brockett v. Winkle Terra Cotta Co., 8 Cir., 81 F.2d 949, 953; First National Bank v. Conway Road Estates Co., 8 Cir., 94 F.2d 736, 739; Price v. Spokane Silver & Lead Co., 8 Cir., 97 F.2d 237, 245, 246.

■ Stockholders may not better their position at the cost of bondholders or other creditors; and to justify a retention of a stock interest by stockholders of a debtor it must appear that they have furnished some compensatory additional consideration or have an equity in the estate of the debtor after the rights of creditors are fully provided for. See In re Barclay Park Corporation, 2 Cir., 90 F.2d 595, 597, 598; In re Day & Meyer, Murray &

Young, Inc., 2 Cir., 93 F.2d 657; O'Connor v. Mills, 8 Cir., 90 F.2d 665, 666, 667; Reading Hotel Corp. v. Protective Committee, 3 Cir., 89 F.2d 53; Wayne United Gas Co. v. Owens-Illinois Glass Co., 4 Cir., 91 F.2d 827, 832; Price v. Spokane Silver & Lead Co., supra, at page 245. Compare, In re 620 Church Street Bldg. Corp., 299 U.S. 24, 27, 57 S.Ct. 88, 89, 81 L.Ed. 16.

■ It is the duty of the court of bankruptcy to carefully scrutinize plans of reorganization pioposed for insolvent companies to make certain that the assets belonging to creditors are not, by indirection, diverted to stockholders. In re New York Railways Corp., 2 Cir., 82 F.2d 739, 744; In re Day & Meyer, Murray & Young, Inc., supra, at page 659; Price v. Spokane Silver & Lead Co., supra, at page 245.

■ Even if a large majority of the creditors have approved a plan, that is of no avail to sustain it if it is unfair, discriminatory, inequitable or not feasible. In re Barclay Park Corporation, supra, 90 F.2d 595; First National Bank v. Flershem, 290 U.S. 504, 517–519, 54 S.Ct. 298, 303, 304, 78 L.Ed. 465, 90 A.L.R. 391; In re Day & Meyer, Murray & Young, Inc., supra, at page 659; Price v. Spokane, Silver & Lead Co., supra, at page 245.

■ In many reorganization proceedings such as this, the rights of small, scattered and thoroughly discouraged bondholders are involved. Often they are unable to employ counsel to protect their rights. It is of great importance that the courts of bankruptcy shall see to it that they are not unfairly dealt with.

The petition of this debtor for reorganization should probably have been dismissed on the ground that it was not filed in good faith. Price v. Spokane, Silver & Lead Co., supra, at page 247. The appellants, however, have not asked that that be done. It is possible that in these proceedings some plan can be worked out which will give to the bondholders all that they are entitled to and will secure the elimination of the valueless stock interest.

The debtor's motion to dismiss the appeal because of insufficient assignments of error is clearly without merit, and is overruled.

The order appealed from is reversed and the case remanded for further proceedings not inconsistent with this opinion.